# EXHIBIT 1

## COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT

This Cooperative Research and Development Agreement ("CRADA"), is entered into by and between D'Andrea Brothers, LLC ("D'Andrea") and the U.S. Army Natick Soldier Center, Natick, Massachusetts ("NSC").

A. **WHEREAS**, the Congress in enacting the Federal Technology Transfer Act of 1986, Public Law No. 99-502, October 20, 1986, has found that Federal laboratories' development should be made accessible to private industry, state and local Governments, and has declared that one of the purposes of such Act is to improve the economic, environmental and social well being of the United States by stimulating the utilization of Federally-funded technology developments by such parties;

B. **WHEREAS**, the Federal Technology Transfer Act of 1986 among other technology transfer improvements has provided each Federal agency with the authority to permit the Director of Government-operated Federal laboratories to enter into CRADAs with Federal or non-Federal entities including private firms and organizations for the purpose of providing to or obtaining from collaborating parties, personnel, services, property, facilities, equipment or other resources (but not funds of any Federal party) toward the conduct of specified research and development efforts which may include the disposition of patent rights in the inventions which may result from such collaboration;

C. **WHEREAS**, NSC has performed substantial research with respect to energy/nutrition bars, hereinafter referred to as "the Technology";

D. **WHEREAS**, NSC possesses certain advanced scientific skills, testing facilities, special equipment, information, know-how, and expertise pertaining to the Technology;

E. **WHEREAS**, D'Andrea possesses certain methodologies, information, know-how, and expertise pertaining to commercialization;

F. **WHEREAS**, NSC and D'Andrea are interested in the further development and commercialization of the Technology;

G. **WHEREAS**, D'Andrea is willing to provide resources for further developments of the Technology -- "development" is meant to include activities such as the exploration of applications of interest to the general public and the marketing of products related to the Technology;

H. **WHEREAS**, NSC views its collaboration with D'Andrea to develop the Technology to be in the public interest;

**NOW, THEREFORE**, the parties hereto agree as follows:

## ARTICLE 1 - DEFINITIONS

As used in this CRADA, the following terms shall have the following meanings and such meanings should be equally applicable to both the singular and plural forms of the terms defined:

1.1 "Invention" means any invention or discovery which is or may be patentable under Title 35 of the United States Code or any novel variety of plant which is or may be protectable under the Plant Variety Protection Act (7 U.S.C. 2321 et seq.)

1.2 "Made" in relation to any Invention means the conception or first actual reduction to practice of such invention.

1.3 "Proprietary Information" means any information which embodies trade secrets developed at private expense or which is confidential, scientific, business or financial information provided that such information:

(i) is not generally known or available from other sources without obligations concerning its confidentiality;

(ii) has not been made available by the owners to others without obligation concerning its confidentiality; and

(iii) is not already available to the Government without obligation concerning its confidentiality.

1.4 "Subject Data" means all recorded information first produced in the performance of this CRADA.

1.5 "Subject Invention" means any Invention of D'Andrea or NSC conceived or first actually reduced to practice in the performance of work under this CRADA.

1.6 NSC means "United States of America, as represented by the Natick Soldier Center Laboratory", as abbreviated "NSC" is the NSC in this CRADA.

1.7 Partner: "PARTNER" means D'Andrea Brothers and any surviving ENTITY into which Partner may be merged, or any ENTITY resulting from a consolidation of PARTNER with any other ENTITY.

1.8 End User: "END USER" means any person using LICENSED PRODUCT (S) for his/her own personal use, or any ENTITY using LICENSED PRODUCT (S) in the regular conduct of its own business and not for licensing to other ENTITIES or individuals.

1.9 Technology to be Licensed: "TECHNOLOGY" means the intellectual property and data licensed in this agreement consisting of United States Trademark HooAH!® number 2,139,166 and United States Trademark HooAH!® and design number 2,139,165,

1.10 Government: "GOVERNMENT" means the Federal Government of the UNITED STATES.

1.11 Gross Revenues: "GROSS REVENUES" means monies or the monetary value of all considerations earned by D'Andrea from its sale, wholesale and/or retail, of LICENSED PRODUCTS. Gross Revenues only applies to commercial sales of LICENSED PRODUCTS and not to any sales to the US Government.

1.12 Licensed Product: "LICENSED PRODUCT" means any product, method, or SERVICE in the field of use of energy/nutrition bars, the production, manufacture, SALE, lease, USE, or practice of which utilizes, in any way, the TECHNOLOGY.

1.13 Sale: "SALE" means a WHOLESALE AND/OR RETAIL transaction of LICENSED PRODUCT(S) for which consideration is received by PARTNER. A SALE of LICENSED PRODUCT (S) shall be deemed completed at the time PARTNER receives payment for such LICENSED PRODUCT (S).

1.14 SUBPARTNER: "SUBPARTNER" is any entity to which D'Andrea sublicenses the TECHNOLOGY, pursuant to the authority granted in this LICENSE AGREEMENT. SUBPARTNER does not include retailer(s).

1.15 United States: "UNITED STATES" means the United States of America, its territories and possessions, the District of Columbia, and the Commonwealth of Puerto Rico.

1.16 Use/Using: "USE" means any form of practice or utilization of the TECHNOLOGY, LICENSED PRODUCT (S), or any portion thereof.

**ARTICLE 2 - COOPERATIVE RESEARCH**

2.1 Statement of Work. Cooperative research performed under this CRADA shall be performed in accordance with the Statement of Work ("SOW") attached hereto as Appendix A. NSC and D'Andrea agree to perform the cooperative research and to utilize such personnel resources, facilities, equipment, skills, know-how and information as they consider necessary, consistent with their own policies, missions and requirements.

2.2 Review of Work. Periodic conferences shall be held between NSC and D'Andrea personnel for the purpose of reviewing the progress of work. Each party shall have exclusive control and supervision over the conduct of its research. It is understood that the nature of this cooperative research is such that completion within the period of performance specified cannot be guaranteed. Accordingly, it is agreed that all cooperative research is to be performed on a reasonable, best efforts basis.

2.3 Principal Investigation. NSC will assign a substantial portion of its work to be performed pursuant to the SOW to the Combat Feeding Directorate at the U.S. Army Natick Soldier Center in Natick, Massachusetts. The work will be performed under the supervision of Fred Costanza (for NSC) and Christian D'Andrea (for D'Andrea Brothers, LLC), who, as principal investigators, have the responsibility for the scientific and technical conduct of this project. This responsibility of principal investigation shall transfer to successors of Fred Costanza and/or Christian D'Andrea.

2.4 Scope Change. If at any time the principal investigators determine that the research data justify a substantial change in the direction of the work, the parties shall make a good faith effort to agree on any necessary change to the SOW.

## ARTICLE 3 - REPORTS

3.1 Interim Reports. Commencing 6 months after the date of this CRADA, each party shall submit semiannual written reports to the other party during the term of this CRADA on the progress of its work under this CRADA and the results being obtained and shall make available to the other party, to a reasonable extent, other project information in sufficient detail to explain the progress of the work.

3.2 Final Reports. Each party shall submit to the other party a final written report of its results within 6 months after completing the SOW.

## ARTICLE 4 - FINANCIAL OBLIGATION

4. FINANCIAL OBLIGATIONS

4.1 Earned Royalties. In further consideration for the rights granted in this Agreement, PARTNER shall pay to NSC, in the manner designated herein, an earned royalty of four percent (4%) of PARTNER's GROSS REVENUES, beginning on the EFFECTIVE DATE and ending on the termination date of this Agreement, as described in Article 9.

4.2 Earned Royalty Adjustments. All obligations of PARTNER to pay earned royalties under this AGREEMENT shall cease upon the date registration of the Marks HooAH!® and the registered HooAH!® and design end or are held to be invalid by a court of competent jurisdiction from which no appeal can be taken.

4.3 Pass Through Royalties. In addition to all other royalties payable hereunder, PARTNER shall pay to NSC a "pass through royalty" on all royalty payments and all other considerations received by Partner for sales of LICENSED PRODUCT (S) by SUBPARTNER or for grants of sublicenses for the TECHNOLOGY by Partner to any SUBPARTNER. The pass through royalty shall be thirty three percent (33%) of all such consideration received by Partner which shall specifically include, but not be limited to, all license issue fees and initial payments, earned royalties, minimum royalties, equity interests and any other thing(s) of value of whatever kind and nature.

Pass through royalty payments shall be paid to NSC in conjunction with PARTNER's earned royalty payments. Pass through royalty payments shall be accompanied by written reports, as required with PARTNER's earned royalty payments.

4.4 In case for any reason, including no GROSS REVENUES of PRODUCTS, the periodic royalties due from D'Andrea do not aggregate a minimum of Twenty Thousand Dollars ($20,000.) in the fourth year after the date of execution and in any year thereafter, D'Andrea shall, at next-occurring semi-annual royalty payment date specified in Article 4.6 herein make up the deficiency of the royalties actually paid to such minimum sum. Therefore, the minimum royalty due from D'Andrea per year, beginning with the fourth year after the date of execution, with or without GROSS REVENUES is Twenty Thousand Dollars ($20,000.).

4.5 Royalties shall be payable in U.S. currency (dollars). All payments shall be made without deduction of taxes, assessments, or other charges of any kind which may be imposed on NSC by the Government of the U.S. or any political subdivision thereof.

4.6 D'Andrea shall pay royalties accrued on each following April 15th or October 15th, whichever date next occurs. D'Andrea shall submit with its payment the written report required in Article 4.10 of this Agreement. If no royalties are due, the report shall so state.

4.7 D'Andrea shall pay within thirty (30) days from any termination of this Agreement royalties (including minimum royalties) accrued or accruable for payment at the time of any such termination.

4.8 Royalty payments not received by NSC by the due date shall be subject to interest charges computed at ten percent (10%) per annum, and charged monthly.

4.9 No royalty shall be payable under this Agreement for direct or indirect sales of LICENSED PRODUCTS by D'Andrea to the U.S. Government.

4.10 With each payment of royalties or at the time such payments are due although no royalties have accrued, D'Andrea shall submit a written report setting forth for the period of accrual of such royalties, the amount of LICENSED PRODUCTS made, sold or otherwise disposed of by D'Andrea, the gross sales thereof, and the amount of royalties due thereon. If no royalties are due NSC for any report period, the report shall so state. Each report shall also state efforts of D'Andrea to commercialize the LICENSED PRODUCTS.

4.11 Earned royalties shall accrue at the time PARTNER receives GROSS REVENUES. All amounts accrued for the benefit of NSC shall be deemed held in trust for the benefit of NSC until payment of such amounts is made pursuant to this Agreement.

4.12 Books and Records. D'Andrea shall keep true and complete records relating to sales of PRODUCTS sold under this Agreement. Such records shall be made available for audit once per year on the anniversary date of the effective date of this CRADA, provided that such anniversary date falls on a weekday that is not a recognized government holiday, and if such date is a weekend date or recognized government holiday, then on the first available non-weekend, non-holiday day thereafter. If such anniversary date is not convenient, or if one day is not enough time, in the opinion of NSC, the parties shall agree to a convenient date(s) for the audit. Such agreement shall not be unreasonably withheld by either party. The audit shall be carried out by NATICK representatives, designated and paid for by NATICK, and shall be maintained for at least two (2) years following the end of this Agreement. In the event the territory covered hereunder includes or shall be extended to include more than one country, D'Andrea shall maintain sales records separately for each country. Should an audit show that D'Andrea owes NATICK more than $500 or five percent of the royalties due to Natick under this agreement (whichever amount is greater), then D'Andrea shall reimburse NATICK for the reasonable costs of the audit.

4.13 D'Andrea shall pay to NSC a one percent (1%) royalty on its gross sales of any other product(s) (non-LICENSED PRODUCT(S)) bearing the HooAH! trademark(s).

## ARTICLE 5 - TITLE TO PROPERTY

5.1 Capital Equipment. All capital equipment developed or acquired under this CRADA shall be the property of the party developing or acquiring such equipment. No exchange of equipment between the parties is contemplated under this CRADA.

5.2 Transfer/Disposal of Materials. Each party agrees to transfer and dispose of material developed or used under this CRADA and located at its facility at its own expense and in accordance with related Federal, State and Local requirements.

## ARTICLE 6 - PATENT AND TRADEMARK RIGHTS

6.1 Reporting. NSC shall promptly report to D'Andrea each Subject Invention reported to NSC by its employees. D'Andrea shall promptly report to NSC each Subject Invention reported to D'Andrea by its employees.

6.2 D'Andrea Subject Inventions. NSC, on behalf of the U.S. Government, waives any ownership rights the U.S. Government may have in Subject Inventions made solely by D'Andrea employees (a D'Andrea Subject Invention) and agrees that D'Andrea shall retain title to any such D'Andrea Subject Invention. D'Andrea agrees to grant and hereby grants to the U.S. Government on any D'Andrea Subject Invention a nontransferable, nonexclusive, irrevocable, paid-up license to practice or have practiced the Subject Invention throughout the world by, or on behalf of, the U.S. Government, except for the use of Subject Invention for any commercial, nongovernmental purpose. Such nonexclusive license shall be evidenced by a confirmatory license agreement prepared by NSC and D'Andrea in a form satisfactory to NSC and D'Andrea. D'Andrea may transfer its rights provided for by this Section to others subject to the license granted to NSC.

6.3 NSC Subject Inventions and Joint Subject Inventions. NSC, on behalf of the U.S. Government retains title to each Subject Invention made solely by its employees (a NSC Subject Invention). If a Subject Invention is made jointly by a D'Andrea employee and a NSC employee (a Joint Subject Invention), the parties will consult as to future actions toward establishment of patent protection for the Joint Subject Invention. Such consultation shall be made within a reasonable time after each party is aware of such Joint Subject Invention. However, unless each party desires to retain its title to a Joint Subject Invention, in which case title will be jointly held by the parties, or unless otherwise agreed by the Parties for each Joint Subject Invention, D'Andrea shall have the initial option to acquire full title to each Joint Subject Invention. In the event D'Andrea informs NSC that it elects to retain title to any such Joint Subject Invention, NSC, on behalf of the U.S. Government, agrees to assign whatever right, title and interest NSC has in and to such Joint Subject Invention under mutually acceptable terms which shall include provisions for royalty income to the U.S. Government in accordance with the principles set forth in Section 6.6.2 below, based upon the recognition that the title rights transferred to D'Andrea are at least equivalent to an exclusive license, and a reservation of a paid-up, nontransferable, nonexclusive, irrevocable license to practice and have practiced the Joint Subject Invention by or on behalf of the U.S. Government. D'Andrea agrees that in the event D'Andrea does not wish to retain its title, D'Andrea shall first offer NSC the right to acquire D'Andrea's title. If NSC acquires full title in the Joint Subject Invention and an exclusive license under Section 6.6 is not granted to D'Andrea in the Joint Subject Invention, or in a NSC Subject Invention, D'Andrea reserves a nontransferable, nonexclusive, irrevocable, paid-up license to practice the Joint Subject Invention or NSC Subject Invention, or have the Joint

Subject Invention or NSC Subject Invention practiced throughout the world by or on behalf of D'Andrea.

6.4 Filing of Patent Applications. The party retaining (or acquiring) title to a specific Subject Invention retains the right to file patent applications thereon. However, such party may elect not to file patent applications thereon and agrees to so advise the other party of such election promptly upon making such decision in sufficient time to allow for filing patent applications. Thereafter, the other party may elect to file patent applications on such Subject Invention and the party initially reporting such Subject Invention agrees to assign its right, title and interest in such Subject Invention, subject to Section 6.3 above, to the other party and cooperate with such party in the preparation and filing of patent applications thereon. In the event neither of the parties to this CRADA elects to file a patent application on a Subject Invention, either or both (if a Joint Subject Invention) may, at their sole discretion and subject to reasonable conditions, release the right to file to the inventor(s) subject to the retention by the parties hereto of nonexclusive, irrevocable, paid-up licenses to practice, or have practiced, the Subject Invention throughout the world.

6.5 Patent Expenses. The expenses attendant to the filing and prosecution of patent applications as specified in Section 6.4 above, shall be borne by the party filing the patent application. Each party shall provide the other party with copies of the patent applications it files on any Subject Invention along with the power to inspect and make copies of all documents retained in the official patent application files by the applicable patent office. The party retaining title to a Subject Invention shall pay all required maintenance fees. If a party decides not to pay any such required maintenance fee, such party shall inform the other party of such decision in time so that said other party may pay such maintenance fee if it desires to keep such patent(s) active.

6.6 Exclusive License.

6.6.1 Grants. NSC, on behalf of the Government, hereby agrees to grant and hereby grants, subject to Section 6.6.2, below, to D'Andrea an exclusive license in the field of use of energy bars/nutrition bars, in each Subject Invention, and in each U.S. patent application and corresponding foreign patent applications, and patents issued thereon, covering a Subject Invention, which is filed by NSC on behalf of the U.S. Government, (a "Patented Subject Invention") subject to the reservation of an irrevocable, nontransferable, nonexclusive, royalty-free license to practice and have practiced the Subject Invention on behalf of the U.S. Government, and such other terms and conditions as are mutually agreed upon by NSC and D'Andrea in such exclusive license. Such exclusive licenses shall be for an initial term ending five (5) years from the date of issuance of each patent and with respect to each such patent shall be automatically renewed for successive five (5) year periods provided D'Andrea is then conducting research directed towards the commercialization of the subject matter covered by such patent and/or continues to commercialize the subject matter covered by such patent. In the event an exclusive license is granted to D'Andrea, the provisions for the license shall survive the termination of this CRADA.

6.6.2 License Terms. Where applicable, NSC and D'Andrea shall negotiate in good faith a reasonable specific royalty rate within four (4) months from the date that a United States or foreign patent is granted for a Subject Invention. The reasonable royalty rate for each license shall be based upon a portion of the selling price of the item attributable to the presence of claimed subject matter where such item is a machine, article of manufacture, product made

by a process, or composition of matter as defined by the claims of the patents. Where the claimed subject matter relates to a process or method to be practiced under the claims of the patent, the royalty will be based upon the net savings attributable to the implementation of said process or method. Where a license is based upon a patented Joint Subject Invention, the specific royalty rate for that patent will be adjusted to reflect the joint inventive contributions of D'Andrea.

6.7 Other NSC Inventions. This CRADA does not grant an implied license to D'Andrea with respect to any other government inventions, including any NSC inventions not covered by Section 6.6. NSC agrees to grant a nonexclusive license to D'Andrea to such other NSC inventions if requested by D'Andrea on fair and reasonable terms, if such nonexclusive license is necessary for D'Andrea to practice any Subject Invention under this CRADA, but only to the extent that NSC has an unencumbered right and/or authority to do so. Nothing in this CRADA shall be construed as a grant or an agreement to grant any license with respect to any invention made by any other U.S. Army laboratory or any other Government agency or laboratory.

6.8 Commercialization of Subject Inventions. D'Andrea agrees that if NSC assigns title or grants an exclusive or partially exclusive license to any NSC Subject Invention or any Joint Subject Invention to D'Andrea, the Government shall retain the right:

(i) to require D'Andrea to grant to a responsible applicant a nonexclusive, partially exclusive, or exclusive license to use the invention in the applicant's licensed field of use, on terms that are reasonable under the circumstances; or

(ii) if D'Andrea fails to grant such a license, to grant the license itself.

The Government may exercise such right only if the Government determines that:

(iii) the action is necessary to meet health or safety needs that are not reasonably satisfied by D'Andrea; or

(iv) the action is necessary to meet requirements for public use specified by Federal regulations, and such requirements are not reasonably satisfied by D'Andrea; or

(v) D'Andrea has failed to comply with any agreement that products embodying any Subject Inventions or products produced through the use of any Subject Inventions will be manufactured substantially in the United States.

This determination is subject to administrative appeal and judicial review under section 203(2) of title 35, United States Code.

Before the government can require D'Andrea to grant a license as described in section "i" above or grant such license itself as described in section "ii" above, notice must be given to D'Andrea that the Government considers certain of D'Andrea's efforts to be unsatisfactory (according to the criteria established in sections "iii", "iv", or "v" above). After notice is given, a reasonable period of time must be given to D'Andrea to 1) satisfy the Government that conditions "iii", "iv", or "v" are in fact not extant (if D'Andrea believes that to be the case), or 2) to correct the indicated shortcomings. "A reasonable period of time" shall be understood to mean four (4) months (similar in duration to the good faith negotiation timeframe defined in section 6.6.2 above).

6.9 GRANT

6.9.1 Grant of Rights. Subject to the terms and conditions of this AGREEMENT, NSC hereby grants to PARTNER:

(a) exclusive license rights to use the US Trademarks HooAH!® number 2,139,166 and HooAH!® design number 2,139165 in connection with the sale of energy and nutrition bars and products where NSC may lawfully grant such license rights, for the term of this Agreement, and

(b) Rights to the Use of Subcontractors. It is mutually understood and anticipated by the parties that D'Andrea may employ and use subcontractors or affiliates (namely an entity that performs work in connection with the commercialization of the LICENSED PRODUCT without receiving a license or a sublicense) in fulfilling its commitments under this CRADA. Nothing in this CRADA shall be construed as a prohibition or restriction of D'Andrea's right to employ and use subcontractors.

6.9.2 Rights to Sublicense

The license rights granted under this Agreement shall specifically include the right for PARTNER to grant sublicenses. PARTNER agrees that any sublicense it grants to any third party shall be granted under the following conditions:

Sublicense rights shall be granted only to third parties that can reasonably demonstrate a strong capability and specific plan for the effective development and marketing of the TECHNOLOGY, which shall benefit PARTNER's and NSC's mutual purposes and which shall be in accordance with NSC's and PARTNER's intent to rapidly commercialize the TECHNOLOGY.

Within thirty (30) days after the execution of a sublicense agreement, as authorized herein, PARTNER shall forward to NSC a fully executed copy of such sublicense agreement. In addition to providing NSC with a copy of the executed sublicense agreement, should such sublicense agreement be written in a language other than English, PARTNER shall provide NSC with an English translation of the sublicense agreement.

Each sublicense shall make reference to this Agreement including the rights retained by the Government. Each sublicense agreement shall also include a provision stating that the sublicense agreement shall automatically be modified or terminated, in whole or in part, upon any modification or termination, in whole or in part, of this Agreement. Such modification or termination of the sublicense agreement shall be consistent with and reflect the modifications or termination of this Agreement.

6.9.3 Rights Reserved

Notwithstanding the rights granted herein, NSC specifically reserves the rights to manufacture, have manufactured or USE the TECHNOLOGY for its own internal non-commercial purposes, including continuing research, development, testing, and all other USES.

All rights granted in this AGREEMENT are expressly granted subject to the nonexclusive, nontransferable, irrevocable, royalty-free rights of the GOVERNMENT to practice and have practiced the TECHNOLOGY for governmental, non-commercial purposes on behalf of (A) the GOVERNMENT and (B) any foreign government or international organization pursuant to any existing or future treaty or agreement with the UNITED STATES. This reservation specifically includes the right to engage in research, involving the non-commercial practice of the TECHNOLOGY, either solely within the GOVERNMENT Agencies or with one or more third parties.

**ARTICLE 7 - DATA AND PUBLICATION**

7.1 Rights. NSC agrees that information that results from research and development activities conducted under this CRADA and that would be a trade secret, or commercial or financial information that is privileged or confidential if the information had been obtained from D'Andrea, shall be protected against dissemination for a period of 5 (five) years after development of said information. NSC agrees to cooperate with D'Andrea in good faith to maximize the protection of such trade secrets. However, notwithstanding the above, the Parties agree that NSC can disclose such information, including such trade secrets, at any time, and if necessary under a non-disclosure agreement, for use in acquiring goods and/or services, including energy/nutrition bars, for non-commercial use on behalf of the U.S. Government.

7.2 Proprietary Information. D'Andrea shall place a Proprietary Notice on all Proprietary Information it delivers to NSC under this CRADA, or advise NSC, in writing, of the proprietary nature of such disclosure within 30 days of such disclosure if made verbally or visually. NSC agrees that any Proprietary Information, which is furnished by D'Andrea to NSC under this CRADA, or in contemplation of this CRADA, shall be used by NSC only for the purpose of carrying out this CRADA. Proprietary Information shall not be disclosed, copied, reproduced or otherwise made available in any form whatsoever to any other person, firm, corporation, partnership, association or other entity without the prior written consent of D'Andrea except as such information may be subject to disclosure under the Freedom of Information Act (5 U.S.C. 552). NSC agrees to use its best efforts to protect Proprietary Information from unauthorized disclosure. D'Andrea agrees that NSC is not liable for the disclosure of Proprietary Information which, after notice to and consultation with D'Andrea, NSC determines may not lawfully be withheld or which a court of competent jurisdiction requires to be disclosed.

7.3 Release Restrictions. NSC shall have the right to use all Subject Data for any Governmental purpose; but shall not release such Subject Data publicly except: (i) NSC when reporting on the results of its research under this CRADA may publish Subject Data, subject to the provisions of Sections 7.1 and 7.2 above and Section 7.4 below, and provided D'Andrea is given a sixty (60) day opportunity to review the manuscript and provide suggestions before publication; and (ii) NSC may release any Subject Data where such release is required pursuant to a request under the Freedom of Information Act (5 U.S.C. 552); provided, however, that such data shall not be released to the public if a patent application is to be filed (35 U.S.C. Section 205) until the party having the right to file has had a reasonable time to file.

7.4 Publication. NSC and D'Andrea agree to confer and consult prior to the publication of Subject Data to assure that no Proprietary Information protected from dissemination by Section

7.2, or that no privileged information protected from dissemination by Section 7.1 is released and that patent rights are not jeopardized. Prior to submitting a manuscript for review, which contains the results of the research under this CRADA, or prior to publication if no such review is made, each party shall be offered an ample opportunity to review such proposed publication and to file patent applications in a timely manner, if it is so entitled under this CRADA.

## ARTICLE 8 - REPRESENTATIONS AND WARRANTIES

8.1 Representations and Warranties of NSC. NSC hereby represents and warrants to D'Andrea as follows:

8.1.1 Organization. NSC is a Federal laboratory of the U.S. Army and is wholly owned by the U.S. Government. NSC's substantial purpose is the performance of research, development and engineering by employees of said Government.

8.1.2 Mission. The performance of the activities specified by this CRADA are consistent with the mission of NSC.

8.1.3 Authority. All prior reviews and approvals required by regulations or laws have been obtained by NSC prior to the execution of this CRADA. NSC has the requisite power and authority to enter into this CRADA and to perform according to the terms thereof. The NSC official executing this CRADA has the requisite authority to do so.

8.1.4 Statutory Compliance. NSC's Laboratory Director, prior to entering into this CRADA, has given special consideration to the entering into CRADAs with small business firms and consortia involving small business firms.

8.2 Representations and Warranties of D'Andrea. D'Andrea hereby represents and warrants to NSC as follows:

8.2.1 Corporate Organization. D'Andrea as of the date hereof, is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

8.2.2 Power and Authority. D'Andrea has the requisite power and authority to enter into this CRADA and to perform according to the terms thereof.

8.2.3 Due Authorization. The Board of Directors and stockholders of D'Andrea have taken all actions required to be taken by law, D'Andrea's Certificate or Articles of Incorporation, its bylaws or otherwise, for the execution and delivery of this CRADA.

8.2.4 No Violation. The execution and delivery of this CRADA does not contravene any material provision of, or constitute a material default under any material agreement binding on D'Andrea or any valid order of any court, or any regulatory agency or other body having authority to which D'Andrea is subject.

## ARTICLE 9 - TERMINATION

9.1 Termination by Mutual Consent. D'Andrea and NSC may elect to terminate this CRADA, or portions thereof, at any time by mutual consent. The provisions of Article 6, Article 7, Section

5.2 of Article 5 and Section 11.4 of Article 11 shall survive the termination of this CRADA by such mutual consent.

9.2 Expiration/Termination The Term of this CRADA shall expire at the end of five (5) years from the date of execution, which is the date of the last signature of the Parties to this CRADA. Upon completion of that Term, this CRADA shall be automatically renewed for successive five (5) year terms. At any time, including during the first five (5) years, either party may notify the other party that it intends to unilaterally terminate the CRADA. Such termination shall occur at the end of the five (5) year term during which such notification occurred, provided that such notification is made at least one (1) year prior to the expiration of that term. Any Patent license(s) and payments for such license(s) under Article 6.2 through 6.8 granted to D'Andrea under this CRADA, shall survive the termination or expiration of this CRADA.

## ARTICLE 10 - DISPUTES

10.1 Settlement. Any dispute arising under this CRADA which is not disposed of by agreement of the principal investigators shall be submitted jointly to the signatories of this CRADA. A joint decision of the signatories or their designees shall be the disposition of such dispute. Although the parties may use Alternate Dispute Resolution (ADR) techniques to resolve disputes, nothing in this CRADA, precludes either party from pursuing resolution of a dispute using other legal review available by law.

10.2 Continuation of Work. Pending the resolution of any dispute or claim pursuant to this Article, the parties agree that performance of all obligations shall be pursued diligently in accordance with the direction of the NSC signatory.

## ARTICLE 11 - LIABILITY

11.1 Property. The U.S. Government shall not be responsible for damages to any property of D'Andrea provided to NSC or acquired by NSC pursuant to this CRADA and D'Andrea shall not be responsible for damages to any property of NSC or the U.S. Government provided to D'Andrea or acquired by D'Andrea pursuant to this CRADA.

11.2 Employees. D'Andrea agrees to indemnify and hold harmless the U.S. Government for any loss, claim, damage, or liability of any kind involving an employee of D'Andrea arising in connection with this CRADA, except to the extent that such loss, claim, damage or liability arises from the negligence of NSC or its employees. NSC shall be responsible for the payment of all claims for the loss of property, personal injury or death, or otherwise arising out of any negligent act or omission of its employees in connection with the performance of work under this CRADA solely under the provisions of the Federal Tort Claims Act.

11.3 No Warranty. Except as specifically stated in Article 8, neither party makes any express or implied warranty as to any matter whatsoever, including the conditions of the research or any invention or product, whether tangible or intangible, made, or developed under this CRADA, or the ownership, merchantability, or fitness for a particular purpose of the research or any invention or product.

11.4 Indemnification. D'Andrea holds the U.S. Government harmless and indemnifies the Government for all liabilities, demands, damages, expenses and losses arising out of the use

by D'Andrea or any party acting on its behalf or under its authorization, of NSC's research and technical developments or out of any use, sale or other disposition by D'Andrea or others acting on its behalf or with its authorization, of products made by the use of NSC's technical developments, except for any claims and liabilities covered under 11.2. This provision shall survive termination of this CRADA.

11.5 Force Majeure. Neither party shall be liable for any unforeseeable event beyond its reasonable control not caused by the fault or negligence of such party, which causes such party to be unable to perform its obligations under this CRADA (and which it has been unable to overcome by the exercise of due diligence), including, but not limited to, flood, drought, earthquake, storm, fire, pestilence, lightning and other natural catastrophes, epidemic, war, riot, civic disturbance or disobedience, strikes, labor dispute, or failure, threat of failure, or sabotage of the NSC or D'Andrea facilities, or any order or injunction made by a court or public agency. In the event of the occurrence of such a force majeure event, the party unable to perform shall promptly notify the other party. It shall further use its best efforts to resume performance as quickly as possible and shall suspend performance only for such periods of time as is necessary as a result of the force majeure event.

## ARTICLE 12 – MISCELLANEOUS

12.1 No Benefits. No member of, or delegate to the United States Congress, or resident commissioner, shall be admitted to any share or part of this CRADA, nor to any benefit that may arise therefrom; but this provision shall not be construed to extend to this CRADA if made with a corporation for its general benefit.

12.2 Governing Law. The construction, validity, performance and effect of this CRADA for all purposes shall be governed by the laws applicable to the Government of the United States.

12.3 Entire Agreement. This CRADA and appendices, constitute the entire agreement between the parties concerning the subject matter hereof and supersede any prior understanding or written or oral agreement relative to said matter.

12.4 Headings. Titles and headings of the Articles, Sections and Subsections of this CRADA are for the convenience of references only and do not form a part of this CRADA and shall in no way affect the interpretation thereof.

12.5 Waivers. None of the provisions of this CRADA shall be considered waived by any party hereto unless such waiver is given in writing to all other parties. The failure of any party to insist upon strict performance of any of the terms and conditions hereof, or failure or delay to exercise any rights provided herein or by law, shall not be deemed a waiver of any rights of any party hereto.

12.6 Severability. The illegality or invalidity of any provisions of this CRADA shall not impair, affect, or invalidate the other provisions of this CRADA.

12.7 Amendments. If either party desires a modification in this CRADA, the parties shall, upon reasonable notice of the proposed modification by the party desiring the change, confer in good faith to determine the desirability of such modification. Such modification shall not be effective until a written amendment is signed by all the parties hereto by their representatives duly authorized to execute such amendment.

12.8 Assignments. Neither this CRADA nor any rights or obligations of any such party hereunder shall be assigned or otherwise transferred by either party without the prior written consent of the other party except that D'Andrea may assign this CRADA to the successors or assignees of a substantial portion of D'Andrea business interests (via a sale to another business entity, public offering, or otherwise) to which this CRADA directly pertains.

12.9 Notices. All notices pertaining to or required by this CRADA shall be in writing and shall be signed by an authorized representative and shall be delivered by hand or sent by certified mail, return receipt requested, with postage prepaid, addressed as follows:

If to D'Andrea: D'Andrea Brothers, LLC
625 S. Ridgeley Dr.
Second Floor
Los Angeles, CA 90036.

If to NSC: U.S. Army Soldier Systems Center
Attn: BD&MT (Technology Transfer Manager)
15 Kansas Street
Natick, Massachusetts 01760

Any party may change such address by written notice given to the other party in the manner set forth above.

12.10 Independent Contractors. The relationship of the parties to this CRADA is that of independent contractors and not as agents of each other or as joint ventures or partners. Each party shall maintain sole and exclusive control over its personnel and operations.

12.11 Use of Name or Endorsements. By entering into this CRADA, neither party directly or indirectly endorses any product or service provided, or to be provided, by the other party, its successors, assignees, or licensees. D'Andrea has the right to use any factual information regarding formal relationships between Natick/the U.S. Government and the Technology, Products, D'Andrea, and mark(s). D'Andrea has the right to rely on any factual information provided to D'Andrea by NSC under the CRADA.

12.12 Marking. Notwithstanding Section 12.11, whereas NATICK has adopted and is using the mark HooAH!® and the mark HooAH!® and design ("mark(s)"), as shown in APPENDIX A-1, and has registered the mark(s)with the U.S. Patent and Trademark Office as trademarks Reg. No. 2,139,166 and Reg. No. 2,139,165, respectively; and whereas D'Andrea desires to use the mark(s) for its LICENSED PRODUCTS and for commercializing its LICENSED PRODUCTS, it is agreed that:

1. D'Andrea has an exclusive right to use the mark(s) for the commercial sales and purposes described herein. The terms and conditions of this CRADA shall apply to this right unless such terms and conditions are amended hereby. The U.S. Government retains the right to use or to have used for or on behalf of the Government the mark(s) throughout the world for Government purposes.

2. NATICK shall have the right to make visit(s) to any facilities of D'Andrea, such visit(s) being announced in advance to D'Andrea, to inspect processes and formulation(s). NATICK

shall also have the right to inspect D'Andrea's goods and promotional activities employing the mark(s) to ensure that such use is of proper quality and otherwise consistent with this CRADA.

3. D'Andrea is prohibited from challenging or contesting in any way NATICK's registration of the mark(s) with the U.S. Patent and Trademark Office, or with any other trademark office, or NATICK'S exclusive worldwide ownership of the mark(s).

4. Before D'Andrea uses the mark(s), it shall send a copy of a representative LICENSED PRODUCT with the mark(s) to, and obtain written approval from, Combat Feeding Directorate, Performance Enhancement and Food Safety Team (AMSRD-NSC-CF-P, U.S. Army Natick Soldier Center, NATICK, MA 01760-5035. NSC may base its own approval on third-party testing and development. In addition, after approval is obtained, D'Andrea shall abide by the following:

(A). NATICK considers the mark(s) to be its trademarks, and holds them out to the public as such.

D'Andrea in using the mark(s) shall clearly indicate that the mark(s) are Federally registered with the U.S. Patent and Trademark Office and such indication of registration shall include the form of the "®" designation.

(B). D'Andrea has the right to use any factual information regarding the formal relationship between Natick/ the U.S. Government and the Technology, Products, D'Andrea, and mark(s).

5. D'Andrea is required to notify NATICK of any potential infringement of the mark(s) of which D'Andrea is aware, or reasonably should be aware. NATICK retains the right to determine what constitutes infringement and the course of action to be taken to address it.

D'Andrea shall also notify NATICK of any claims of which D'Andrea is aware that the mark(s) is infringing the name, logo or trademark of another.

6. D'Andrea shall make best efforts to ensure that any production extrusion and cooling equipment used under this CRADA is at the level of standard commercial energy bar production equipment.

7. NATICK shall have the right to immediately terminate this right if D'Andrea discontinues business (unless occurring after an authorized assignment in Section 12.8), or becomes insolvent, or if any action relating to the bankruptcy or insolvency of D'Andrea is instituted. Termination shall occur if D'Andrea alters the NATICK formulation(s) in any way unless agreed to by the primary technologist for the LICENSED PRODUCT at NATICK or his/her supervisor.

8. D'Andrea agrees to indemnify and hold NATICK harmless from any and all claims, damages and attorneys' fees arising from the use of the mark(s) by D'Andrea and its operations under this CRADA, except for any such claims, damages, or attorneys' fees which arose in connection with any act or failure to act by the U.S. Department of the Army or any agency, department or subdivision thereof.

9. If D'Andrea is dissolved (unless occurring after an authorized assignment in Section 12.8), NATICK shall have the right to terminate this Amendment at will.

10. D'Andrea is authorized to register the mark(s) in any foreign countries, and may secure such registrations. However, all rights in such registrations shall belong to the United States of America as represented by the Secretary of the Army upon termination of this Amendment. If NATICK decides to register the mark(s) in one or more foreign countries, D'Andrea agrees to provide all lawful assistance, as reasonable, to NATICK.

**ARTICLE 13 - DURATION OF CRADA AND EFFECTIVE DATE**

13.1 It is mutually recognized that the development program cannot be rigidly defined in advance, and that the contemplated time periods for completion of each phase (as delineated in 9.2) are good faith guidelines subject to adjustment by mutual agreement, to fit circumstances as the development program proceeds.

13.2 Effective Date. This CRADA shall enter into force as of the date of the last signature of the parties.

IN WITNESS THEREOF, each of the parties hereto has caused this CRADA to be executed by its duly authorized officers or representatives as follows:

For D'Andrea: Christian D'Andrea

Christian D'Andrea
Director D'Andrea Brothers, LLC Date: 1/12/04

For the U.S. Government Philip Brandler

Philip Brandler
Director Natick Soldier Center Date: 1-14-04

## APPENDIX A

## STATEMENT OF WORK

Cooperative Research and Development Agreement (CRADA) between U.S. Army Natick Soldier Center ("NSC") and D'Andrea Brothers, LLC ("D'Andrea")

**Objective:** Research and development leading to increased effectiveness (if possible) and availability of the HooAH!® Energy Bar. To ensure that the processing parameters and formulation as described in PCR (Product Contract Requirements) nomenclature for the HooAH!® Bar, reference: PCR-H-008, HOOAH!® BARS, SHELF STABLE should be strictly adhered to for ensuring that a consistently acceptable PRODUCT bearing the "HooAH!®" and/or "HooAH!® and design" bar name and label is provided to consumers (both commercial and military). Both parties recognize that D'Andrea may make modifications to the processing parameters and formulation in order to commercialize the LICENSED PRODUCT; and D'Andrea recognizes that these modifications must be approved prior to use (as discussed in 12.12.4).

**NATICK** will provide some or all of the following:

- Shelf stable tests, organoleptic evaluations and acceptance data of up to two (2) newly developed Processing Parameters/formulation per year of interest to the military. NSC may opt to conduct more than two (2) such tests. (Some test(s) may require funding from D'Andrea to NSC because of costs to NSC. NSC may opt not to provide such tests. However, for any tests by NSC, which require funding from D'Andrea, the Parties will negotiate the tests and the funding thereof.)
- Expertise in food preservation technologies
- Expertise in packaging materials for extended shelf life of foods
- Expertise in research and development of performance type products

**D'Andrea** will provide some or all of the following:

- Research into new product formulations and improved capability to scale-up production of new items
- Marketing research
- Analytical testing to ensure product quality
- Expertise in vitamin and mineral fortification
- Expertise in extrusion technology
- Commercialization of the HooAH!® Bar

## APPENDIX A-1

MARKS

The following trademarks shall be included under this CRADA and collectively referred to as the mark(s).




®




®