# In the United States Court of Federal Claims

**No. (08-286C)**
**(Filed: June 4, 2010)**

```
* * * * * * * * * * * * * * * *
                              *
D'ANDREA BROTHERS LLC,        *
                              *
         Plaintiff,           *
                              *
v.                            *
                              *
THE UNITED STATES,            *
                              *
         Defendant.           *
                              *
* * * * * * * * * * * * * * * *
```

## ORDER GRANTING PROTECTIVE ORDER

Pending before the court is a motion by the defendant, the United States ("government"), for a protective order seeking the return or destruction of documents that were inadvertently disclosed to the plaintiff, D'Andrea Brothers LLC ("D'Andrea Brothers") during the course of discovery. In response, the plaintiff argues that it is entitled to review these and other documents withheld or redacted by the government on the grounds that the government has waived its attorney-client privilege. For the reasons that follow, the government's motion is **GRANTED**.

## BACKGROUND

This case arises from a dispute regarding a Cooperative Research and Development Agreement ("CRADA" or "agreement") between the plaintiff and the U.S.

Army Natick Soldier Research, Development and Engineering Center ("Natick"). The

five-year agreement took effect in January 2004 and concerned the development and

"commercialization" of nutritional bars. The CRADA, among other things, granted

D'Andrea Brothers an exclusive license to the HooAH!® trademark and the HooAH!®

design (collectively "trademarks") "for the commercial sales and purposes described [in

the CRADA]." (Compl. Ex. 1.)

In its complaint, the plaintiff alleges, inter alia, that the government breached the

CRADA, as well as the implied covenant of good faith and fair dealing, by failing to

support D'Andrea Brothers's efforts to sell its HooAH! nutritional bars to the military.

The plaintiff alleges that Natick "sabotag[ed]" the plaintiff's efforts to sell its bars to the

military. Further, the plaintiff alleges that Natick knowingly and intentionally allowed

other companies, including Sweet Productions ("Sweet"), to sell other nutritional bars

using the HooAH! trademarks to the military in violation of the plaintiff's exclusive

license.

## A.      Prior Ruling on Government's Motion for Judgment

The present discovery dispute has its roots in an earlier decision converting the

government's motion for judgment on the pleadings pursuant to Rule 12(c) of the Rules

of the Court of Federal Claims ("RCFC") to a motion for summary judgment under

RCFC 56.[1]  The court rejected the government's motion for judgment on the pleadings on

_____

[1]The prior decision was issued by Judge Edward Damich on April 16, 2009. The case
was transferred on April 21, 2010.

the ground that "[T]he term 'commercial' or 'non-commercial,' is not defined in the

CRADA and is unclear.  Therefore, the Court finds that the meaning and scope of the

terms 'commercial' or 'non-commercial' is, with respect to the CRADA, ambiguous."

(Order 1, April 16, 2009.)  The court established a discovery schedule.  Once discovery is

completed, the parties will have an opportunity to supplement their previous filings and

present material pertinent to the government's converted motion for summary judgment.

## B.      Discovery and Present Dispute

On August 21, 2009, the government produced approximately 20,000 documents

in response to the plaintiff's first request for production of documents.[2]  The U.S.

Department of Justice ("DOJ") attorney mistakenly believed that all of the documents had

been screened for privilege.  The DOJ attorney learned, however, that a set of documents

she had received from Natick's counsel and produced to the plaintiff had not been

screened for attorney-client or work product evidentiary privileges.  She also learned that

two other privileged documents were inadvertently disclosed, even though they had been

screened for privilege.  The DOJ attorney states, and the plaintiff does not dispute, that all

together she inadvertently disclosed seventy-four unredacted documents which she now

claims are privileged.[3]

---

[2]This request included all internal emails regarding HooAH! trademark, the HooAH! bar, and the D'Andrea Brothers CRADA.

[3]Seventy-two of the seventy-four inadvertently disclosed documents are within the range of documents unscreened by Natick's counsel, namely documents D10368 through D10988.  The other two were from the set of documents that were screened but still inadvertently disclosed.

The government did not learn of the inadvertent disclosure until after September 2, 2009, when the plaintiff, during depositions of several government witnesses, asked questions regarding attorney-client communications contained in the inadvertently disclosed documents.  The government counsel objected to the plaintiff's questions during the depositions and asserted the government's clawback rights under RCFC 26(b)(5)(B).[4]

Thereafter, on September 9, 2009, government counsel emailed the plaintiff asserting the government's clawback rights pursuant to RCFC 26(b)(5)(B) and requesting that the plaintiff conduct no further review of documents marked D10368 through D10735 until government counsel had given the plaintiff redacted versions.  On September 14, 2009, the government provided to the plaintiff a revised copy of the privilege log and a revised DVD containing redacted (sixty-one documents) or deleted (thirteen documents) versions of documents previously inadvertently disclosed and for which the government now claims a privilege.  When the plaintiff failed to return the

---

[4]The rule provides:

If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it.  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim.  The producing party must preserve the information until the claim is resolved.

RCFC 26(b)(5)(B).

documents, the government filed the pending motion for a protective order.  The

government argues that its claim for inadvertent disclosure is based on Rule 502 of the

Federal Rules of Evidence ("FRE").[5]

The plaintiff argues in response to the government's motion for a protective order

that regardless of whether the government complied with the requirements of FRE 502,

the government otherwise waived its evidentiary privileges for communications

concerning "the intent, interpretations and negotiations of the CRADA."[6]  (Pl.'s Opp. to

Def.'s Mot. for Prot. Order 2.)  The plaintiff contends that the government waived these

---

[5]The rule provides:

> A disclosure of a communication or information covered by the attorney-client privilege or work product protection does not operate as a waiver in a state or federal proceeding if the disclosure is inadvertent and is made in connection with federal litigation or federal administrative proceedings—and if the holder of the privilege or work product protection took reasonable precautions to prevent disclosure and took reasonably prompt measures, once the holder knew or should have known of the disclosure, to rectify the error, including (if applicable) following the procedures in Fed. R. Civ. P. 26(b)(5)(B).

FRE 502(b).

[6]The plaintiff has not addressed the merits of the government's claim that its disclosure of the documents was inadvertent and that the government has taken reasonable steps before and after to prevent and rectify the disclosure.  Indeed, the plaintiff states that whether disclosure was inadvertent is "irrelevant."  (Pl.'s Opp. to Def.'s Mot. for Prot. Order 3.)

After the parties had completed initial briefing regarding the government's motion for protective order, the court issued an order for supplemental briefing requiring the plaintiff to clarify its argument as to the scope and source of the government's alleged waiver of its privileges.  (Order Jan. 20, 2010.)  The court ordered that because the plaintiff did not raise the inadvertency issue in its opposition to the government's motion, it was not to discuss the issue in its supplemental brief.  The plaintiff filed its supplemental brief on February 10, 2010 (Pl.'s Supp. Br.), and the court granted the government's motion to file a response to this brief, which the government did on April 2, 2010 (Def.'s Supp. Br.).

privileges when: (1) the government produced at least nine witnesses, including a government lawyer (Vincent Ranucci), and approximately 520 documents in its initial disclosures upon which the government may rely in support of its case, including documents that the plaintiff argues contain parol evidence regarding the interpretation, intent, and negotiations of the CRADA; (2) the government designated Mr. Ranucci as a deponent in response to the plaintiff's notice of taking deposition regarding, among other things, negotiation and interpretation of the CRADA, and allowed Mr. Ranucci and other government employees to testify without objection regarding their interpretations of the CRADA; and (3) the government put into issue the "intent, interpretation and negotiations of the CRADA." (Id. at 13; Pl.'s Supp. Br. 2-3.)

In response, the government contends that it complied with the requirements of FRE 502 and that it has not intentionally waived any privileges. As such, it argues that it is entitled to a protective order. For the reasons discussed below, the court agrees with the government.

## DISCUSSION

### A. The Government Has Not Waived its Attorney-Client and Work Product Privileges through the Inadvertent Disclosure of Protected Documents.

First, there is no dispute in this case that the government has met the requirements of FRE 502 and therefore did not waive any privilege by inadvertently disclosing privileged communications to the plaintiff. The recently-enacted FRE 502 clarifies that the inadvertent disclosure of privileged communications will not necessarily operate as a

waiver if certain criteria are met.  That rule provides:

> A disclosure of a communication or information covered by the attorney-client privilege or work product protection does not operate as a waiver in a state or federal proceeding if the disclosure is inadvertent and is made in connection with federal litigation or federal administrative proceedings—and if the holder of the privilege or work product protection took reasonable precautions to prevent disclosure and took reasonably prompt measures, once the holder knew or should have known of the disclosure, to rectify the error, including (if applicable) following the procedures in Fed. R. Civ. P. 26(b)(5)(B).

FRE 502(b).  Here, the government is entitled to return of documents allegedly inadvertently disclosed if the government can establish that: (1) the documents disclosed were privileged; (2) the disclosure was inadvertent; (3) the disclosing party took reasonable steps to prevent such a disclosure; and (4) the disclosing party took reasonable steps to rectify such a disclosure.  See Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. 480, 501- 503 (2009) (citing In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003); Weil v. Inv./Indicators, Research & Mgmt., Inc., 647 F.2d 18, 25 (9th Cir. 1981); Evergreen Trading, LLC, ex rel. Nussdorf v. United States, 80 Fed. Cl. 122, 127 (2007)).

## 1.    The Attorney-Client Privilege Applies to the Disclosed Documents.

"The attorney-client privilege is the client's right to refuse to disclose confidential 'communications between attorney and client made for the purpose of obtaining legal advice.'"[7]  In re United States, 590 F.3d 1305, 1309 (Fed. Cir. 2009) (quoting Genetech,

---

[7]The privilege applies to communications discussing legal advice involving in-house counsel.  See Upjohn Co. v. United States, 449 U.S. 383 (1981).  Likewise, the privilege covers communications between an agency and agency counsel.  Stovall v. United States, 85 Fed. Cl.

Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997)) (citing Fisher v.

United States, 425 U.S. 391, 403 (1976) ("Confidential disclosures by a client to an

attorney made in order to obtain legal assistance are privileged."); Black's Law

Dictionary 1235 (8th ed. 2004)).  For the attorney-client privilege to attach, "the

communication in question must be made: (1) in confidence; (2) in connection with the

provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client

relationship."  Stovall v. United States, 85 Fed. Cl. 810, 813-14 (2009) (quoting

Evergreen Trading, 80 Fed. Cl. at 128; United States v. BDO Seidman LLP, 492 F.3d

806, 815 (7th Cir. 2007), cert. denied, 552 U.S. 1242 (2008)) (citing United States v.

Bisanti, 414 F.3d 168, 171 (1st Cir. 2005); In re Sealed Case, 737 F.2d 94, 98-99 (D.C.

Cir. 1984); Deseret Mgmt. Corp. v. United States, 76 Fed. Cl. 88, 90 (2007)).  Courts

interpreting the scope of the privilege have recognized that it is applicable both to

communications from client to attorney and to communications from attorney to client,

supporting the policy of encouraging "full and frank communication" between them.

Evergreen Trading, 80 Fed. Cl. at 128 (quoting Upjohn Co. v. United States, 449 U.S.

383, 389 (1981)).

 The court has reviewed the revised privilege log noting the seventy-four

---

810, 814 (2009) (citing Rein v. United States Patent & Trademark Office, 553 F.3d 353, 376 (4th
Cir. 2009); Tax Analysts v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997)).

documents that the government claims are privileged.[8]  (App. to Def.'s Mot. for Prot. Order ("Identification of Documents Deleted or Redacted per Defendant's Clawback Assertion").)  The plaintiff has submitted to the court a subset of these documents upon which it would like to rely in this case.[9]  (Pl.'s Opp. Exs. 6-12, 14, 15.)  All of the documents the plaintiff wishes to rely upon are attorney-client privileged documents.

The documents at issue are part of an email chain between various government lawyers, including Mr. Ranucci, John Stone, James Chafin, and Michael McPeak,[10] and other government employees.  As briefly discussed below, each document was generated in connection with the provision of legal services and involves a legal question from the client or a legal opinion by one of the agency lawyers.

Document D10641-45 is a series of emails between Mr. Stone, Kathy Evangelos,

---

[8]The government deleted thirteen of these documents and redacted portions of an additional sixty-one documents.

[9]These documents, numbered D10641-43, D10524, D10391, D10407, D10559-60, D10532-33, D10666, D04609-10, and D05976-80, are those regarding which the plaintiff sought to have government witnesses Gerald Darsch and Kathy Evangelos testify in the depositions that brought the disclosure of documents to the government's attention.  These nine documents constitute approximately twelve percent of the full set of allegedly privileged documents inadvertently disclosed.

[10]Mr. Ranucci was, at the time of the emails, a patent attorney at the Office of Chief Counsel at Natick.  Mr. Stone was a Chief Attorney in the Natick Legal Office.  Mr. Chafin was a trademark and copyright attorney in the Regulatory law and Intellectual Property Division at the U.S. Army Legal Services Agency.  Mr. McPeak was counsel at the Defense Supply Center–Philadelphia ("DSCP").

Gerald Darsch,[11] and Mr. Ranucci regarding the trademark dispute between D'Andrea Brothers and the government.  In this exchange, all four discuss the issue and Mr. Stone discusses the government's legal position.  The document is protected by the attorney-client privilege.

Document D10524 involves an email exchange between Mr. Stone and Natick Director Philip Brandler regarding the trademark dispute with the plaintiff.  In particular, Mr. Brandler poses a question to Mr. Stone, and Mr. Stone renders his legal opinion.  For this reason, the document is protected by the attorney-client privilege.

Document D10391 is an email from Mr. Stone to Mr. Brandler regarding the government's legal position on the trademark dispute with the plaintiff.  The document is thus protected by the attorney-client privilege.

Document D10559-61 is an email exchange between Mr. Stone, Ms. Evangelos, and Joseph Henson,[12] in which Mr. Stone provides legal advice regarding whether the Army may buy bars bearing the HooAH! trademark from a company other than the plaintiff.  The document is thus protected by the attorney-client privilege.

Document D10532 is an email exchange between Mr. Ranucci, Mr. Stone, and Mr. Darsch.  Mr. Darsch asks for a legal opinion from Mr. Stone regarding the trademark dispute, and another email reflects Mr. Ranucci's legal advice to Mr. Stone.  The

---

[11]Mr. Darsch is the Director of the Department of Defense Combat Feeding Directorate at Natick.  Ms. Evangelos is Program Integrator in the same department.

[12]Mr. Henson is a Supervisory Buyer at the Army and Air Force Exchange Service.

10

document is protected in part by the attorney-client privilege.

Document D10407-08 is an email from Ms. Evangelos to Mr. Stone asking for legal advice regarding the trademark issue with Sweet.  The document is protected by the attorney-client privilege.

Document D10666-68 is an email chain between Ms. Evangelos, James Lecollier, Mr. McPeak, Mr. Darsch, and numerous other government employees.[13]  Mr. Lecollier asks Mr. McPeak for guidance regarding D'Andrea Brothers's proposal for selling the plaintiff's bars to the military.  A second email is from Ms. Evangelos to Mr. Lecollier. The substance of the email contains Natick's legal position on the issue, as provided by government lawyers.  The document is thus protected by the attorney-client privilege.

Document D04609-10 is an email from Mr. Stone to Ms. Evangelos and Mr. Darsch forwarding a message from Mr. Chafin to Mr. Stone and Mr. Ranucci.  The forwarded email includes legal recommendations regarding actions the government should take in response to the trademark dispute with D'Andrea Brothers.  The document is thus protected by the attorney-client privilege.

Document D05976-80 is an email chain between Mr. Ranucci, Mr. Stone, Jeffrey DiTullio, Ms. Evangelos, Mr. Chafin, and other agency employees regarding D'Andrea

---

[13]Mr. Lecollier was the Contracting Officer and Chief Individual Rations Branch at DSCP.  Other DSCP employees on the email chain were Frank Bankoff, Lisa Shields, Brad Bellis, Richard Faso, Thomas Daley, Ray Miller, Jesse Cross, William Taylor, and Anne O'Conner.  Also on the chain were Stanley Weeks and Richard Kohler of Marine Corps Foodservice and Subsistence.

Brothers's and the government's obligations under the CRADA and the government's legal position with respect to the CRADA.[14]  The document is thus protected by the attorney-client privilege.

In view of the foregoing, the court is persuaded that the government has established that the documents it seeks to protect are privileged.  The plaintiff does not dispute this assertion and the documents the plaintiff wishes to rely upon are plainly privileged.  The court therefore agrees with the government that it has met its burden of showing that the broader set of identified documents is indeed subject to the attorney-client privilege.[15]

### 2.      The Disclosure Was Inadvertent.

The government asserts that its disclosure of the seventy-four identified documents was inadvertent, and the plaintiff does not dispute this fact.  The government explains that the disclosure of seventy-two of the seventy-four documents was a result of a misunderstanding about the privilege status of a certain set of documents DOJ counsel received from Natick's counsel.  The other two documents were produced in unredacted

---

[14]Mr. DiTullio was the Technology Transfer Manager on the Business Development Team at Natick.  Others persons on the email chain–Jean Trumpis, Arnold Boucher, Anne Sowerbutts, and Mark Daley–were also Army employees.

[15]The court notes that two of these seventy-four documents, D10466 and D10592, are listed as having been redacted under the proprietary information privilege.  The government's log states that the document includes financial information concerning what a competitor of [D'Andrea Brothers] was charging" the government for energy bars or the production of those bars. (App. to Def's Mot. for Prot. Order 5, 9.)  The protected status of these documents does not appear to be disputed by the plaintiff.

form even though they appeared on the privilege log.  The court finds that the government

has satisfied the inadvertent disclosure prong of FRE 502.

### 3.    The Government Took Reasonable Steps to Prevent Disclosure.

The plaintiff does not dispute that the government took reasonable precautions to

prevent disclosure of privileged documents.  First, of the original set of documents

screened by DOJ, only two were improperly produced in unredacted form.  As noted

above, these documents appeared on the privilege log but were inadvertently produced in

unredacted form.  Second, the court agrees that the government also took reasonable

steps to prevent the disclosure of the remaining seventy-two documents that were

improperly produced.  The DOJ counsel explains that she and Army counsel Capt. Lisa

Satterfield instructed Natick and Defense Supply Center–Philadelphia counsel to

segregate privileged documents from non-privileged documents.  Two Natick attorneys

spent two weeks reviewing the Natick files, eliminating duplicate documents,

segregating documents based on discovery request, identifying and segregating

privileged documents, and preparing a draft privilege log for DOJ counsel.  When these

boxes were shipped to DOJ, DOJ counsel believed, based on her instructions and the

amount of time spent, that Natick had finished its privilege review.  It was not until the

deposition of Mr. Darsch that the government learned that privileged documents had been

disclosed.  She then learned from Natick counsel that the Natick attorneys had not

completed the privilege review for the D10368-D10988 set of documents prior to sending

the documents to DOJ.

The court finds, based on the representations of DOJ counsel, that she took reasonable steps to prevent disclosure.  The government has described the volume of documents to be screened, the time frame in which they were to be screened, and the interactions between DOJ and agency counsel leading up to the inadvertent disclosure. The court finds that in this case the government's description of its privilege screening procedures is adequate to establish that its process was reasonable.

### 4.    The Government Took Reasonable Steps to Rectify the Disclosure.

Finally, the court turns to whether the government took reasonable steps to rectify its inadvertent disclosure.  "Inadvertent disclosure has been held to be remedied when the privilege is asserted immediately upon discovery of the disclosure and a prompt request is made for the return of the privileged documents."  Eden Isle Marina, 89 Fed. Cl. at 502 (quoting United States v. Rigas, 281 F. Supp. 2d 733, 741 (S.D.N.Y. 2003) (internal quotation omitted)) (citing Clarke v. J.P. Morgan Chase & Co., 2009 WL 970940, at *6 (S.D.N.Y. Apr. 10, 2009) (holding that defendant's two-month delay in asserting its privilege claim supported a waiver of privilege); Preferred Care Partners Holding Corp. v. Humana, Inc., 258 F.R.D. 684, 699-700 (S.D. Fla. 2009) (holding that a three-week lag time to assert a privilege weighed in favor in finding a waiver of privilege)).  In Eden Isle Marina, the court found that the government's actions following disclosure were far from reasonable where a year and a half passed between disclosure of the protected document

and discovery of the disclosure during a deposition and where government counsel did

not immediately object to use of the memorandum in the deposition, allowed lengthy

questioning even after objecting to use of the memorandum, and then took no affirmative

steps to rectify the disclosure, either by seeking its return via RCFC 26(b)(5)(B),[16] adding

the document to its privilege log, or by seeking a protective order.  Eden Isle Marina, 89

Fed. Cl. at 508.

In this case, the government's actions satisfy the criteria for rectifying the

inadvertent disclosure.  Here, the government inadvertently disclosed the protected

documents on August 21, 2009 and discovered the disclosure during the deposition of Mr.

Darsch on September 2, 2009, less than two weeks later.  The government attorney

objected immediately to the use of the documents, refused to let her witnesses testify to

them, and asserted the government's clawback rights pursuant to RCFC 26(b)(5)(B).  The

government reiterated its assertion of clawback rights in a letter to the plaintiff's counsel

on September 9, 2009, requesting return or destruction of paper and electronic copies of

the privileged documents and that the plaintiff cease its review of documents in the set

that remained unscreened.  Between September 8 and 11, 2009, DOJ counsel identified

the inadvertently disclosed documents and on September 14, 2009, DOJ counsel provided

to the plaintiff a revised privilege log and revised DVD reflecting additional redactions

and deletions.  The government then filed the present motion for protective order on

---

[16]See supra note 4.

15

October 15, 2009.

The court finds that the government's immediate assertion of privilege upon discovery of the disclosure, the formal assertion of clawback rights, and the preparation of a revised privilege log and DVD supports the finding that the government took appropriate steps to rectify its inadvertent disclosure.

For all of these reasons, the court finds that the government has not waived its evidentiary privileges by way of its inadvertent production of privileged documents.

**B.       The Government Has Not Implicitly Waived its Evidentiary Privileges.**

Having concluded that the government has not expressly waived its attorney-client privilege with regard to communications described above, the court next turns to the plaintiff's argument that the government has waived its attorney-client and work product privileges by way of the voluntary disclosure of documents and testimony.  The plaintiff's argument takes three forms: (1) the government selectively produced certain privileged documents, resulting in a waiver of the privileges for other documents of the same type; (2) the government produced witnesses, including an attorney, who were allowed to testify about privileged communications, resulting in a waiver of the privileges for these and other documents of the same type; and (3) the government has put protected communications sufficiently at issue to result in a waiver of the privileges for these protected communications.

The court will examine each part of the plaintiff's implied waiver argument in

turn.

**1.    The Government Has Not Impermissibly Selectively Waived its Privileges through Voluntary Production of Allegedly Protected Documents.**

The plaintiff argues that the government has waived its attorney-client privilege with respect to communications regarding the government's intent, interpretations, and negotiation of the CRADA because the government voluntarily produced certain privileged documents regarding the CRADA.  In particular, the plaintiff identifies a number of documents produced in the government's initial disclosures, arguing that these documents include material subject to the attorney-client or work product privilege.  By producing protected documents, the plaintiff argues, the government has waived its privilege as to other protected documents relevant to the case.[17]

In response, the government contends that it has produced no privileged documents, and so has not waived its evidentiary privileges.

As discussed above, the attorney-client privilege covers communications made "(1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship."  Stovall, 85 Fed. Cl. at 813-14 (citations omitted).  Not every communication between client and attorney is protected.  For example, the privilege does not cover mere factual information.  See

---

[17]The plaintiff's argument that the government has put the intent, interpretations, and negotiation of the CRADA at issue in part through the production of these documents and that these affirmative acts constitute an implicit waiver of the governments privileges is discussed in Part B.3, infra.

Sedco Intern., S. A. v. Cory, 683 F.2d 1201, 1205 (8th Cir. 1982) (citing Upjohn, 449

U.S. at 395-96).  Nor does the privilege protect ordinary business advice, though courts

have recognized the difficulty in differentiating legal advice and business advice in some

contexts.  See id. (citing 8 J. Wigmore, Wigmore on Evidence § 2296 (McNaughton rev.

1961)).  A party may waive its attorney-client privilege directly by relying upon protected

material in support of an assertion.  The policy behind this rule is grounded in fairness:

> Courts will not allow the attorney-client privilege to be used as both a sword
> and a shield.  They will not permit a privilege holder to selectively disclose
> part of a privileged communication, or some larger number of
> communications, that are favorable to the client's position and then raise the
> privilege to prevent disclosure of the remaining portions, or the surrounding
> communications, that give context and meaning to what the client has
> disclosed.

Paul R. Rice, 2 Attorney-Client Privilege in the United States § 9:29 (2010).  Thus, by

waiving the privilege as to some protected communications, the party waives the privilege

as to other communications of the same type.  See Evergreen Trading, 80 Fed. Cl. 122

(citing Genetech, 122 F.3d at 1415).

The court finds that none of the numerous documents identified by the plaintiff

demonstrate either an explicit or implicit waiver of the government's evidentiary

privileges.[18]  (App. to Pl.'s Supp. Br. 4-12, 14, 15; App. to Pl.'s Opp. 27.)  The plaintiff's

brief identifies documents D00148-62, D00190-205, D00218-35, and D00276-99.  Each

---

[18]It is not entirely clear which, if not all, of these documents the plaintiff is arguing were
protected by the government's evidentiary privileges.  For this reason, the court has examined
each of the documents filed in the Appendix to the plaintiff's supplemental brief to determine if
the government has waived its privileges either explicitly or implicitly by their disclosure.

of these documents is an email or emails sent during the period of negotiation of the

CRADA and is between Army personnel–including Robert Rosenkrans, Fred Costanza,

both Natick employees involved in the negotiation of the CRADA, and Mr. Ranucci–and

Christian or Mark D'Andrea, the plaintiffs, and contains an attached draft version of the

D'Andrea Brothers CRADA.  Because these emails are between government personnel

and third parties, no attorney-client or work product privilege could have attached, as

these were not communications made in confidence between client and attorney, nor were

they documents made in anticipation of litigation.  The documents were not protected,

and thus their disclosure did not constitute an express waiver of any privilege.

The plaintiff points also to document D00301, an email between Christian

D'Andrea and numerous government personnel.  Like the documents discussed above,

this email was not subject to any privilege, as it was a communication between the

government and a third party.  Document D00435, an email chain between Christian

D'Andrea and Army personnel, is not subject to the government's evidentiary privilege

for the same reason.

Documents D00021-33 and D00036-41 are the CRADA between the government

and Sterling Foods, Inc. and an amendment to that CRADA, respectively.  As such, these

do not contain internal attorney-client communications, since they, like the documents

discussed above, were shared with third parties outside that attorney-client relationship.

Document D00147 contains two emails, an email from Christian D'Andrea to Mr.

Rosenkrans and an email from Mr. Costanza to Mr. Rosenkrans regarding Mr. Costanza's discussions with Mark D'Andrea.  While Mr. Ranucci, a lawyer, is a recipient of this second email, the email is not one in which Mr. Costanza seeks legal advice.  Rather, the email references only non-privileged communications between government personnel and Mr. D'Andrea.  For this reason, it is not a protected communication.  The first email is clearly not privileged, as it is between a non-lawyer and a third party.

Document D01315-16 is a partially-redacted 2003 email chain which includes Mr. Ranucci and Mr. Stone.  The first email is between Mark D'Andrea and government personnel, and so is not privileged.  The second email is from Mr. Costanza to Mr. Rosenkrans, Mr. Ranucci, and Mr. Darsch.  While Mr. Ranucci is one of the recipients, the email is not one in which Mr. Costanza seeks legal advice.  Rather, Mr. Costanza offers his opinion that if the government and D'Andrea Brothers are unable to work out remaining issues in the CRADA negotiation, the negotiation will fail.  The third email is from Mr. Darsch to other employees, including Mr. Ranucci.  Mr. Darsch is not seeking legal advice, but is instead discussing business strategy regarding the HooAH! trademarks.  The email is thus not protected by the attorney-client privilege, despite its being from a client to an attorney.  The next two emails, between Mr. Ranucci, Mr. Stone, and Mr. Darsch, have been redacted in their entirety.  The final email, from Mr. Darsch to Mr. Stone and other Army personnel, discusses the option of licensing the trademark to Sweet if the negotiations with D'Andrea Brothers were to fail.  The email contains no

request for legal advice, but rather contains only a discussion of facts and business strategy, neither of which are covered by the attorney-client privilege.

Document D01897 is a 2004 email chain including Mr. Ranucci and other government employees. In the first email, from Mr. Ranucci to Mr. Rosenkrans and other government recipients, Mr. Ranucci states that the D'Andrea Brothers and Sweet CRADAs should be kept independent of each other. Though this is a communication from an attorney to a client, the context provided by these other two emails reveals the business rather than legal nature of this advice. The other emails are between government employees discussing the need for strategies for avoiding overlap of these CRADAs. The need for such a strategy appears to stem from the practical issue of simplifying the process of attributing innovations to either D'Andrea Brothers or Sweet under their respective contracts. As such, the discussion is a business one rather than a legal one. The communication is not privileged.

Finally, document D00081 is an email from Mr. Ranucci to Mr. Darsch and other government recipients regarding a call from Christian D'Andrea in which Mr. D'Andrea presumably for the first time expressed interest in marketing the HooAH! bar. The email, though from an attorney to other government personnel, does not include any legal advice.

For the above-stated reasons, none of the documents identified by the plaintiff and intentionally produced by the government are subject to the attorney-client privilege. For

21

this reason, disclosure of these documents did not constitute an impermissible selective disclosure that could result in a waiver of the attorney client privilege by the government.

### 2. The Government Has Not Waived its Evidentiary Privileges through Testimony by Government Witnesses as to Allegedly Privileged Communications.

The plaintiff identifies numerous portions of deposition testimony by government witnesses that the plaintiff argues are instances of a failure to assert the attorney-client privilege, resulting in a waiver.[19]   The plaintiff also argues that the government has waived its privileges by designating Mr. Ranucci, an attorney, as a deponent.

The government contends that there has not been a waiver because none of these witnesses has revealed privileged information through his or her testimony, and government counsel properly asserted the government's privileges during the depositions whenever proper.

### i. Testimony of Mr. Darsch

The plaintiff argues that the government waived its attorney-client privilege by allowing the plaintiff's counsel to examine Mr. Darsch regarding a privileged document without assertion of the privilege.  (App. to Pl.'s Supp. Br. Ex. 16, 58:12-70:13.)  The government contends that because this document, numbered D10315-16, was not subject to the attorney-client or work product privilege, the government did not waive any privilege by allowing this testimony.

---

[19]The plaintiff's argument that deposition testimony by government witnesses constituted an implicit waiver by putting privileged communications at issue is discussed in Part B.3, infra.

The court agrees with the government.  Document D10315-16, discussed above, is a communication involving third parties (including the plaintiff) and is not subject to any privilege, so Mr. Darsch's testimony regarding this document did not amount to a waiver of any privilege.  Rather, his testimony, like the document, contains only unprivileged information.  For instance, in response to one question from plaintiff's counsel regarding this document, Mr. Darsch reads part of the email into the record and states:

> To me, that meant that Fred[ Costanza], in spite of his best efforts, was not making appropriate progress to finalize the CRADA with D'Andrea, and, as director, I wanted to have a CRADA that would allow the commercialization of the product.  I was frustrated with Fred's attempts, and Fred was frustrated, as he indicated in that e-mail, and I was considering pushing the license to someone else so that we could benefit the commercial sector and Department of Defense.

(Id. at 63:06-15.)  Later, in discussing the negotiations, Mr. Darsch stated that he did not mention the government's Army contract with Sweet to D'Andrea Brothers because, "One company was supplying [HooAH!] bars under a Government contract and had been for years.  The objective of the CRADA was to commercialize the [HooAH!] bar . . . ." (Id. at 69:22-25.)  Neither of these statements, nor any of Mr. Darsch's testimony identified by the plaintiff, reveals any privileged information.  Rather, he testifies about an unprivileged document and gives his understanding of the factual context of the CRADA negotiation.

The plaintiff also argues that the government waived its evidentiary privileges when it conducted a direct examination of Mr. Darsch.  (App. to Pl.'s Supp. Br. Ex. 16,

325:16-326:4.)  The government argues that this testimony was not privileged and so no waiver occurred.

The court agrees with the government.  As stated in <u>Wigmore on Evidence</u>:

> The client's offer of his <u>own testimony</u> in the case <u>at large</u> is not a waiver for the purpose either of cross-examining him to the communications or of calling the attorney to prove them.  Otherwise the privilege of consultation would be exercised only at the penalty of closing the client's own mouth on the stand.

Wigmore, <u>supra</u>, § 2327, at 637.  However, "The client's offer of his own or the attorney's testimony as to a <u>specific communication</u> to the attorney is a waiver as to all other communications to the attorney on the same matter."  <u>Id.</u> at 638.  Here, an examination of the testimony demonstrates that it does not reveal the substance of any privileged communication or document.  For example, Mr. Darsch states, "[T]he license, as I understood it, under the CRADA, was for the commercial sale of the [HooAH!] bar and that's what the license is for.  It did not involve sales to the military community." (App. to Pl.'s Supp. Br. Ex. 16, 325:16-326:4.)  Neither this nor any of Mr. Darsch's testimony identified by the plaintiff constitutes a disclosure of privileged communications that could constitute a waiver of the government's privileges.  Mr. Darsch's general testimony of his own understanding of the CRADA does not open the door to the plaintiff's discovery of privileged communications simply because they might form some basis of Mr. Darsch's opinion.

### ii.     Testimony of Mr. Ranucci

The plaintiff argues that the designation of Mr. Ranucci, a government attorney, as

the government's witness in response to the plaintiff's RCFC 30(b)(6) deposition notice

constituted a waiver of the government's attorney-client privileges as to the subject of

that notice.[20]  The plaintiff further argues that while DOJ counsel asserted the attorney-

client privilege and instructed Mr. Ranucci not to answer certain questions, Mr. Ranucci

was allowed to answer other questions that concerned privileged matters.

In response, the government argues that mere designation of Mr. Ranucci as a

witness did not waive any privileges and that Mr. Ranucci's testimony disclosed nothing

privileged.

The court does not agree with the plaintiff's notion that the mere designation of a

government attorney as a witness constitutes a waiver of the attorney-client or work

product privilege.  Designation of corporate in-house counsel, an analogue to an agency

attorney such as Mr. Ranucci, does not amount to a waiver of the attorney-client

privilege, so long as the attorney-witness does not reveal any privileged information.  In

re Pioneer Hi-Bred Intern., Inc., 238 F.3d 1370, 1376 (Fed. Cir. 2001) ("Counsel is often

a fact witness with respect to various events, and may testify on deposition by the

---

[20]The topics for which the government proffered Mr. Ranucci as a witness, as listed on
the deposition notice were:

(1) The Negotiations of the [CRADA] between D'Andrea Brothers, LLC and
[Natick]; (2) Defendant's interpretation of the meaning of the CRADA; (3)
Defendant's interpretation of the terms "commercial" and "commercialization"
within the meaning of the CRADA; and (4) D'Andrea Brothers' Statement of Work,
dated June 23, 2003.

(App. to Pl.'s Supp. Br. Ex. 18.)

opposing party as to such matters without waiver.  A different result would obtain, of course, if counsel were offered to testify as to privileged or protected matters and might obtain if counsel were offered as a fact witness at trial by his client.") (citing United States v. Nobles, 422 U.S. 225, 239 (1975)); Wigmore, supra, § 2327, at 637 ("The client's offer of the attorney's testimony in the case at large is not a waiver so far as the attorney's knowledge has been acquired casually as an ordinary witness.").  Thus, the government's designation of Mr. Ranucci did not itself operate as a waiver of the privilege unless Mr. Ranucci through his testimony revealed privileged information.

After examining the sections of Mr. Ranucci's testimony identified by the plaintiff, the court concludes that this testimony did not involve any disclosure of protected communications.  The government points to Mr. Ranucci's testimony in response to the plaintiff's questions regarding the meaning of the terms "commercial" and "commercialization," including the bases for his understanding of the terms.  (App. to Pl.'s Supp. Br. Ex. 19, 61:17-63:25.)  This testimony, however, does not reveal any privileged information.  For instance, in response to the plaintiff's question about the terms "commercial" and "commercialization" within the CRADA, Mr. Ranucci states:

> That means . . . sales by a non-Federal entity to a non-Federal party.  Those terms distinguish between what a CRADA partner may want to do . . . as opposed to what the government must do under the government's acquisition and procurement law and any other laws that deal with how the government does business.

(Id. at 61:17-62:06.)  Mr. Ranucci goes on to identify the laws he is referencing:

> The government has a set of laws it has to deal by.  And in the terms of the CRADA, when you look at[ 15 U.S.C. §] 3710, it mentions commercial, commercialization.  It doesn't define what those are.  But its written in such . . . a way to distinguish between what the CRADA partner may do, as opposed to what the government may do . . . .

(Id. at 63:19-25.)  In this section of his deposition, Mr. Ranucci is not asked about the substance or nature of any privileged communications, nor does he volunteer any such information.[21]  See Wigmore, supra, § 2327, at 638.  Thus, he discloses nothing privileged that might constitute a waiver of the attorney-client privilege.

For these reasons, neither the designation of Mr. Ranucci as a witness nor his testimony at deposition constituted a waiver of the government's evidentiary privileges.

### iii.    Testimony of Ms. Evangelos

Finally, the plaintiff argues that testimony by Ms. Evangelos, like that of Mr. Darsch and Mr. Ranucci, constituted a waiver of the privilege when she was allowed to voluntarily reveal protected information.  The government argues, as it did above, that the testimony identified did not reveal any privileged information and so did not constitute a waiver of its privileges.

The court once again agrees with the government.  In the identified section of Ms.

---

[21]The government's identification of sections of Mr. Ranucci's testimony where DOJ counsel did invoke the attorney-client privilege are instructive in that these sections illuminate the difference between questions that go to privileged communications and questions that do not. For instance, when plaintiff's counsel asked Mr. Ranucci about the purpose of Mr. Ranucci's speaking with another government attorney regarding the CRADA, DOJ counsel properly invoked the attorney-client privilege to avoid disclosure of the substance of that protected communication.  (App. to Pl.'s Supp. Br. Ex. 19, 41:10-18; see also id. at 45:4-15, 53:17-57:25, 169:4-14, 184:6-185:19.)

Evangelos's deposition, the plaintiff asks her for her understanding of the goal of the

CRADA and who the plaintiff could sell its HooAH! bar to.  Ms. Evangelos testified:

> [C]ommercializing the product has to do with the D'Andrea[ Brothers]
> developing a product that could be sold to the general public and to make a
> profit.
> . . .
> My understanding of who the D'Andrea Brothers could sell their commercial
> product to is anyone–you mean within the military?  To anyone who wanted
> to purchase it.  Under whatever authority they're able to purchase it.

(App. to Pl.'s Supp. Br. Ex. 20, 268:21-23, 269:21-25.)  Ms. Evangelos answers without

reference to any specific communication that would be protected by the attorney-client

privilege.[22]  For this reason, Ms. Evangelos's testimony, like that of Mr. Darsch and Mr.

Ranucci, did not waive the government's attorney-client or work product privileges

through a disclosure of protected information.

### 3.     The Government Has Not Implicitly Waived its Evidentiary Privileges by Putting Protected Communications at Issue.

Finally, the plaintiff argues that the government has waived its evidentiary

privileges by putting attorney-client communications at issue in the litigation.  The

plaintiff asserts that the government has done this by producing documents and allowing

testimony regarding the government's intent, interpretation, and negotiation of the

CRADA.  The plaintiff contends that the government has demonstrated an intent to rely

on certain documents and witnesses in support of its case and that such reliance

---

[22]Again, it is helpful to look to those times during the deposition where DOJ counsel invoked the privilege.  (See App. to Pl.'s Supp. Br. Ex. 10, 161:7-21, 169:10-173:20, 186:12-187:7, 252:3-252:9, 258:2-259:6.)

constitutes a waiver of the government's evidentiary privileges.

The government argues that no such implicit waiver has occurred because the government does not intend to rely on any privileged communication to support its interpretation of the CRADA.  More generally, the government contends that the implied waiver doctrine is otherwise inapplicable here because protected communications are not at issue.

A party may implicitly waive its privilege by placing privileged communications at the heart of the issue in dispute, for example by asserting reliance on an attorney's advice as an element of a claim or defense.  Stovall, 85 Fed. Cl. at 815 (citing Sedco Intern., 683 F.2d 1201).  Under the "in issue" or "at issue" doctrine, courts may find a waiver of the privilege where "the nature of the litigant's allegations place the contents of a privileged communication in issue."  Edward J. Imwinkelried, The New Wigmore 876-77 (Richard D. Friedman, ed. 2002); see also In re EchoStar Commc'ns Corp., 448 F.3d 1294, 1301 (Fed. Cir. 2006); In re Seagate Tech., LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007).[23]  "The orthodox view . . . is that the fact that communications between attorney

---

[23]The policy behind the attorney-client privilege waiver doctrine is one of fairness.  See Wigmore, supra, § 2327, at 636-36.
  As explained by a classic case on the topic:

  All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party.  The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some

and client may be <u>relevant to</u> an issue the client has raised does not alone justify finding a

waiver."  Rice, <u>supra</u>, § 9:51 (emphasis in original); <u>see also</u> 81 Am. Jur. 2d <u>Witnesses</u> §

336.  Rather, the party claiming the privilege must have affirmatively thrust protected

information into the dispute, such as through a reservation of the right to use otherwise

protected parol evidence in support of its interpretation of a contract.  <u>See</u> <u>Stovall</u>, 85 Fed.

Cl. at 816 (citations omitted).[24]  Importantly, the <u>plaintiff's</u> assertion of an issue putting

attorney-client communications in issue cannot waive <u>defendant's</u> privilege, as the party

asserting an issue cannot waive its adversary's privilege.  <u>Cencast Servs., L.P. v. United</u>

---

> affirmative act, such as filing suit, by the asserting party; (2) through this affirmative
> act, the asserting party put the protected information at issue by making it relevant
> to the case; and (3) application of the privilege would have denied the opposing party
> access to information vital to his defense.  Thus, where these three conditions exist,
> a court should find that the party asserting a privilege has impliedly waived it through
> his own affirmative conduct.

<u>Hearn v. Rhay</u>, 68 F.R.D. 574 (E.D. Wash. 1975); <u>see also</u> <u>Zenith Radio Corp. v. United States</u>, 764 F.2d 1577 (Fed. Cir. 1985) (citing <u>Hearn</u>); <u>Blue Lake Forest Prods., Inc. v. United States</u>, 75 Fed. Cl. 779, 783 (2007); Imwinkelried, <u>supra</u>, at 877.

    [24]The plaintiff relies heavily on <u>Stovall</u>, but slightly misstates the case's holding.  In <u>Stovall</u>, the court found an implied waiver because the government did not foreclose "introducing parol evidence–either in documentary or testimonial form–that is based upon or impacted by the written and oral advice provided by the [agency] attorneys."  <u>Stovall</u>, 86 Fed. Cl. 770, 773 (2009) (denying the government's motion for reconsideration following its submission of a statement that the government would not rely directly on agency attorneys).  Thus, the court did not find a waiver as a result of the intent to rely on extrinsic evidence generally, but instead from the intent to rely upon parol evidence that specifically was based on or impacted by privileged communications.  The plaintiff seems to argue that <u>any</u> use of extrinsic evidence, including evidence not covered by the attorney-client privilege, can constitute a waiver of the privilege.  The court finds no compelling precedent to support this view.  The plaintiff relies in part on <u>Medtronic, Inc. v. United States</u>, 162 F.R.D. 133 (D. Minn. 1995), in which that court, in dicta, stated that had the party asserting a privilege offered "<u>any</u> extrinsic evidence," its privilege would be waived.  <u>Id.</u> at 135 (emphasis added).  The court notes that this decision is not binding precedent and goes beyond the more moderate views expressed in this circuit.

States, 91 Fed. Cl. 496, 509 (2010).  To determine whether there has been a waiver, courts look to the specific allegation affirmatively putting the privileged material at issue, the content of that privileged information, and the relationship between the allegation and the information.  Imwinkelried, supra, at 881.

The court is thus tasked with determining whether the government has indeed through an affirmative act indicated that it will rely upon privileged materials to bolster its interpretation of the CRADA, or whether it has otherwise put privileged communications sufficiently at issue that the plaintiff would be at an unfair disadvantage were it not given access to those protected communications.  The court agrees with the government that it has neither demonstrated any intent to rely upon protected materials in support of its case, nor has it otherwise made the substance of privileged materials an issue in the case.

Here, it cannot be said that the government has placed privileged communications at the heart of the dispute between the parties.  The government has not, for instance, filed any pleadings in which it injects the contents of attorneys' advice as the basis for any defense.  See Imwinkelried, supra, at 877.[25]  Indeed, the government has indicated that it

---

[25]The classic examples all involve the "advice of counsel" as either a claim or defense:

> For instance, in a jurisdiction requiring the plaintiff in a fraud action to establish the reasonableness of his or her reliance on the defendant's misrepresentation, the plaintiff might aver that he or she consulted an attorney about the representation. Alternatively, to negate willfulness in a patent infringement case, a defendant could file an answer alleging that the client relied in good faith on correspondence with the client's patent attorney.  Or, in its responsive pleading in a Title VII case, as an

does not intend to rely upon any attorney-client communications to support its interpretation of the CRADA.  (Def.'s Reply to Pl.'s Opp. 17-18 ("[E]ven though some of the documents discuss the Government's understanding of the term 'commercial,' which is likely to be favorable to the position we have taken on the issue, we do not intend to use any of the documents in support of [the government's] motion for summary judgment.").  Here, the court agrees with the government that it has not put any privileged communications in issue on the grounds that it has persuasively established that it does not intend to rely on any such communications to support its case.

## CONCLUSION

For all the foregoing reasons, the court finds that the government has not waived its evidentiary privileges by its inadvertent disclosure of protected materials. Additionally, the court finds that the government has not waived any privilege by intentionally disclosing or relying upon protected materials.  There is no evidence that the government made any intentional disclosures or is relying upon privileged communications to support its interpretation of the CRADA at issue in this case. Therefore, the government's motion for a protective order is **GRANTED**.  Accordingly,

---

 affirmative defense the defendant might allege that it acted reasonably in investigating a sexual harassment complaint because it consulted outside counsel about the complaint.  To meet such a defensive allegation about an investigation conducted by defendant's counsel, the plaintiff needs to challenge the adequacy of the investigation.

Imwinkelried, supra, at 877-78 (citations omitted throughout).

(1) the plaintiff shall return the original and all copies of the CD including documents

D00521-D16919; (2) the plaintiff shall destroy or delete all copies, paper and electronic,

of all documents the government has identified as having been inadvertently disclosed;

(3) the court reporter who transcribed the depositions of Mr. Darsch and Ms. Evangelos

shall remove and destroy all copies of Darsch Exhibit Nos. 18, 22, 23, 24, 25, 39, and 40

and Evangelos Exhibit Nos. 9, 10, and 21 from the deposition transcripts and replace

these exhibits with redacted copies of the exhibits; (4) the plaintiff shall not depose any

government witnesses regarding any redacted portion of the documents identified as

having been inadvertently disclosed that has since been redacted or deleted; and (5) the

plaintiff shall not rely upon any of the protected information inadvertently disclosed by

the government.


**IT IS SO ORDERED.**


s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge