# In the United States Court of Federal Claims

No. 08-286C
(Filed: February 8, 2013)

|  |  |  |
|---|---|---|
| D'ANDREA BROTHERS LLC, | ) | |
| | ) | |
| | ) | **CRADA and Licensing Agreement;** |
| Plaintiff, | ) | **Breach of the Implied Covenant of** |
| | ) | **Good Faith and Fair Dealing;** |
| v. | ) | **"Reasonableness" Standard; Prior** |
| | ) | **Material Breach; Reliance Damages;** |
| THE UNITED STATES, | ) | **Restatement (Second) of Contracts §** |
| | ) | **349** |
| Defendant. | ) | |
| | ) | |
| | ) | |

*Paul Allan Traina*, Los Angeles, CA, for plaintiff. *Jared Wesley Beilke*, Los Angeles, CA, of counsel.

*Sheryl Lynn Floyd*, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant. *Major Tyson McDonald*, Department of the Army, Fort Belvoir, VA, of counsel.

## TRIAL OPINION

**FIRESTONE**, *Judge*.

This breach of contract case involves a contract, called a Cooperative Research and Development Agreement ("CRADA"),[1] between the United States Army Natick

---

[1] This court has previously held that the CRADA at issue in this case is a contract. D'Andrea Bros. LLC v. United States, 96 Fed. Cl. 205, 214 (2010). CRADAs are authorized by the Federal Technology Transfer Act ("FTTA"), 15 U.S.C. § 3710a (2006). The primary purpose of the FTTA is to encourage technology transfer from federal government-operated laboratories to private industry. See Chem Serv., Inc. v. Envt'l Monitoring Sys. Lab.-Cincinnati of the U.S. EPA, 12 F.3d 1256, 1258 (3d Cir. 1993). Under the FTTA, the director of any federal

Soldier Research, Development, and Engineering Center ("Natick")[2] and plaintiff

D'Andrea Brothers LLC ("plaintiff").  The CRADA, among other things, provided that

plaintiff would commercialize nutritional energy bars, then called HooAH! bars,[3] that had

been developed by Natick and were included in the operational rations provided to

soldiers by the military.  The CRADA granted plaintiff an exclusive five-year license to

the Army's HooAH! trademarks for commercial sales of the energy bars, in exchange for

payment of royalties to Natick for use of the trademarks.  The government, for its part,

agreed under the CRADA to engage in cooperative research and to help plaintiff test and

improve Natick's HooAH! rations bar.  Plaintiff in this case is seeking approximately

$1.95 million in reliance damages for the government's alleged breach of the implied

covenant of good faith and fair dealing inherent in the CRADA.  The government in a

counterclaim is seeking approximately $60,000 for unpaid royalties.

    In an earlier summary judgment decision, the court rejected several of plaintiff's

claims and limited the issues to be decided at trial.  Plaintiff originally asserted both an

express breach of the CRADA and a breach of the implied covenant of good faith and fair

dealing.  In its summary judgment opinion, the court denied plaintiff's express breach

claim, which alleged that the government had breached the CRADA by allowing other

companies to use the HooAH! trademarks for sales of energy bars to the military,

---

government-operated laboratory may enter into CRADAs with private entities.  15 U.S.C. §
3710a(a)(1)-(2).

[2] Natick is, among other things, charged with developing and improving rations for the military.
D'Andrea, 96 Fed. Cl. at 208 n.2.

[3] "HooAH!" is the battle cry of the United States Army.  D'Andrea, 96 Fed. Cl. at 209 n.3.

pursuant to the government procurement process for military rations.  The court found

that the CRADA expressly reserved the government's right to use the HooAH!

trademarks for any governmental purpose without limitation, including in procuring

energy bars for its rations.[4]  The court also held that the CRADA "was focused on

[plaintiff] finding ways to sell bars to the general public separate from current use of the

trademarks" for military rations.[5]  D'Andrea Bros. LLC v. United States, 96 Fed. Cl. 205,

219 (2010).  In this regard, the court limited the scope of the CRADA to encompass only

sales in the commercial market and in the military commercial market—such as sales to

military post exchanges outside of the procurement context—and to exclude sales to the

government via government procurement of the bars for operational rations.

However, the court also held in its summary judgment opinion that disputed issues

of fact precluded summary judgment on plaintiff's breach of good faith and fair dealing

claim, based on evidence that the government breached its obligation to cooperate with

plaintiff and to not "bad mouth" plaintiff to others within and outside the government.

Id. at 222.  The court found that plaintiff had put in issue the government's good faith and

fair dealing by identifying circumstances of "bad mouthing" plaintiff's product to others,

by abandoning the HooAH! name and changing the military rations bar name from

---

[4] The court held this holding was consistent with the statutory language of the FTTA, 15 U.S.C. § 3710a, which "contemplates that the government in a CRADA may not bargain away its own right to use any license obtained by the government for its own purposes."  D'Andrea, 96 Fed. Cl. at 221.

[5] The court further found that the government did not breach the implied covenant of good faith and fair dealing by entering into CRADAs with other private entities that also involved the commercialization of energy bars.

"HooAH!" to "First Strike," and by generally failing to cooperate with plaintiff during a significant period of the CRADA term.  The court did not resolve the government's counterclaim for unpaid royalties on summary judgment.

At trial, the court heard testimony and received evidence regarding plaintiff's breach of good faith and fair dealing claim, damages related to that breach claim, and the government's counterclaim.  In Part I of this opinion, the court summarizes the largely uncontested background testimony and evidence introduced at trial in order to provide context to the discussion that follows.  In Part II, the court summarizes the remaining relevant evidence introduced at trial and its findings and conclusions specifically in regard to plaintiff's breach claim.  In Part III, the court will address the evidence introduced at trial and its findings and conclusions as to the government's counterclaim, and in Part IV, the court will address the evidence and its findings and conclusions regarding damages.

## I.    BACKGROUND

Plaintiff D'Andrea Brothers LLC was founded in 2003 by three brothers, Christian D'Andrea, Mark D'Andrea, and Paul D'Andrea.  The subject CRADA was the product of negotiations that began in 2003 when Christian D'Andrea contacted Natick to find out whether the HooAH! trademarks, which appear on energy bars distributed to soldiers in operational rations called "Meals Ready to Eat" ("MREs"), were available for license.  See Plaintiff's Exhibit ("PX") 1; Trial Transcript ("Tr.") 12-13 (Christian D'Andrea); D'Andrea, 96 Fed. Cl. at 209-10.  Mr. Christian D'Andrea had learned of the bars while filming a documentary about soldiers and stated that he was interested in marketing the

bars to the public.  <u>See</u> Tr. 11 (Christian D'Andrea).  Plaintiff submitted a proposed

statement of work to Natick in June 2003, expressing the company's plans to market and

commercialize the HooAH! bar.  Tr. 14 (Christian D'Andrea); PX2.  A final version of

this statement of work was eventually attached as an appendix to the CRADA.

### A.    The CRADA and the Statement of Work

Following negotiations between Natick and plaintiff, the final CRADA was signed

on January 14, 2004.  Tr. 25 (Christian D'Andrea); Joint Exhibit ("JX") 1 at 16.  Mr.

Gerald Darsch, the Director of the Combat Feeding Directorate at Natick, oversaw the

CRADA negotiations, and eventually became the point person for the CRADA in March

of 2004.  Tr. 266-67 (Gerald Darsch).  Ms. Kathy Evangelos, a member of the Combat

Feeding Directorate and a part of Mr. Darsch's team, also had a coordination role in

implementing the CRADA with plaintiff.  Tr. 444-47 (Kathy Evangelos).

### 1.    The CRADA.

As discussed at length in the court's prior summary judgment opinion in this case,

<u>D'Andrea</u>, 96 Fed. Cl. at 210-11, the subject CRADA provided for a five-year term from

the date of its execution—from January 2004 to January 2009.  It contained an automatic

renewal provision, but provided that either party could unilaterally terminate the CRADA

at the end of the five-year term with at least one-year advance notice.  JX1 at 12.  It

began with several "whereas" clauses describing the areas of expertise each party would

bring to the agreement:

> C.  WHEREAS, [Natick] has performed substantial research with respect to
> energy/nutrition bars, . . .

D.  WHEREAS, [Natick] possesses certain advanced scientific skills, testing facilities, special equipment, information, know-how, and expertise pertaining to [energy/nutrition bars];

E.  WHEREAS, D'Andrea possesses certain methodologies, information, know-how, and expertise pertaining to commercialization;

F.  WHEREAS, [Natick] and D'Andrea are interested in the further development and commercialization of [energy/nutrition bars];

G.  WHEREAS, D'Andrea is willing to provide resources for further development of [energy/nutrition bars]– "development" is meant to include activities such as the exploration of applications of interest to the general public and the marketing of products related to [energy/nutrition bars]. . .

JX1 at 1.  Article 2, Section 1 of the CRADA, entitled "Cooperative Research," explained that cooperative research performed under the CRADA would be performed in accordance with the final Statement of Work, attached to the CRADA, and discussed below.  JX1 at 3.  Article 3 of the CRADA provided that each party would submit semi-annual reports to the other party on the progress of its work under the CRADA.  JX1 at 4.

A major component of the CRADA was the licensing of the HooAH! trademarks. The CRADA was in this regard unique, as compared to others at Natick, because it involved trademarks, licensing, and royalty payments.  Tr. 694 (Mr. Gerald Darsch testifying that Natick "never had a CRADA that involved . . . the licensing and the royalties").  Regarding the HooAH! trademarks, the CRADA included the following provision:

6.9.1 Grant of Rights:  Subject to the terms and conditions of this AGREEMENT, [Natick] hereby grants to [plaintiff]:

(a)  exclusive license rights to use the US Trademarks HooAH!® number 2,139,166 and HooAH!® design number 2,139[,]165 in connection with the sale of energy and nutrition bars and products

6

where [Natick] may lawfully grant such license rights, for the term
of this Agreement . . .

JX1 at 9.

Plaintiff obtained under the CRADA "the exclusive right to use the [trademarks] for the commercial sales and purposes described herein." JX1 at 14 ¶ 12.12.1. This included the use of the HooAH! trademarks on its energy bars, as well as on other related products plaintiff could develop under the CRADA.[6] JX1 at 14 ¶ 12.12. The CRADA also provided that plaintiff had, in its commercialization efforts, the "right to use any factual information regarding formal relationships between Natick/the U.S. Government and the" energy bars, plaintiff, and the trademarks. JX1 at 14, ¶ 12.11. However, in order to use the trademarks on its commercial energy bars, plaintiff had to obtain approval of its commercial energy bar formulation from the Performance Enhancement and Food Safety Team at Natick. JX1 at 15 ¶ 12.12.4. During the CRADA period, Natick apparently approved plaintiff's formulation of several different flavored commercial bars.

In exchange for the use of the HooAH! trademarks, plaintiff agreed to pay Natick semi-annual royalty payments of four percent of gross energy bar sales for the first three years of the CRADA. JX1 at 4. Beginning with the fourth year, which began in 2007, the CRADA provided that plaintiff would pay a minimum royalty payment of $20,000. JX1 at 4. Plaintiff also agreed to pay Natick a one percent royalty on its gross sales of other products bearing the HooAH! trademarks. JX1 at 5.

---

[6] For example, plaintiff had developed HooAH! energy drinks under the CRADA. See DX21 (an April 14, 2006 royalty report listing gross sales from HooAH! drinks).

Finally, Article 9 of the CRADA governed the termination of the agreement.  That article provided that the term of the CRADA

> shall expire at the end of five (5) years from the date of execution, which is the date of the last signature of the Parties to this CRADA.  Upon completion of that Term, this CRADA shall be automatically renewed for successive five (5) year terms.  At any time, including during the first five (5) years, either party may notify the other party that it intends to unilaterally terminate the CRADA.  Such termination shall occur at the end of the five (5) year term during which such notification occurred, provided that such notification is made at least one (1) year prior to the expiration of that term.

JX1 at 12.  Therefore, under this termination clause, either party could unilaterally terminate the CRADA at the end of the first term in January 2009, provided that it gave the other party notice at least one year prior to the expiration of the CRADA term.

## 2.      The Statement of Work.

The attached Statement of Work described the objectives of the CRADA and the parties' responsibilities in reaching these objectives.  First, the Statement of Work listed as an objective "[r]esearch and development leading to increased effectiveness (if possible) and availability of the HooAH!® Energy Bar."  JX1 at 17.  In this regard, the Statement of Work required that the parties ensure that the commercial HooAH! bar met certain product standards, referred to as Product Contract Requirements, in line with the military formulation of the HooAH! bar.  JX1 at 17.

However, the Statement of Work also allowed plaintiff to "make modifications to the processing parameters and formulation in order to commercialize the" HooAH! bars.  JX1 at 17.  Pursuant to the CRADA, Natick had to approve these formula modifications prior to use of the trademarks on the commercial bars.  JX 1 at 15 ¶ 12.12.4, 17.

The Statement of Work then went on to list the parties' responsibilities in performing cooperative research under the CRADA:

> NATICK will provide some or all of the following:
> - Shelf stable tests, organoleptic evaluations and acceptance data of up to two (2) newly developed Processing Parameters/formulation per year of interest to the military.  [Natick] may opt to conduct more than two (2) such tests. . .
> - Expertise in food preservation technologies
> - Expertise in packaging materials for extended shelf life of foods
> - Expertise in research and development of performance type products
>
> D'Andrea will provide some or all of the following:
> - Research into new product formulations and improved capability to scale-up production of new items
> - Marketing research
> - Analytical testing to ensure product quality
> - Expertise in vitamin and mineral fortification
> - Expertise in extrusion technology
> - Commercialization of the HooAH!® Bar.

JX1 at 17.

## B.    The Early CRADA Period: 2004-2006

### 1.    Development of the commercial HooAH! bar

Both parties agreed that things were going well under the CRADA for the first two years.  See JX2 (a May 2005 email from Mr. Christian D'Andrea to Mr. Darsch and Ms. Evangelos stating "Our CRADA is going very well."); Tr. 37 (Christian D'Andrea); PX9 (an April 2005 email from Mr. Darsch to Mr. Christian D'Andrea stating, "It's indeed a pleasure to partner with a high speed focused company such as yours."); see also Tr. 612 (Mr. Mark D'Andrea testifying that in October 2006 he "thought that everything was going quite well and that we were working together with the partner [Natick]").  Pursuant

to the CRADA, plaintiff reformulated the military HooAH! bar to provide a higher protein, trans-fat-free commercial bar with Natick's apparent approval, and began marketing this commercial bar using the HooAH! label.  Tr. 30-31 (Christian D'Andrea).

Plaintiff's reformulated commercial bars were first available for sale in August 2004, and were at the outset available in convenience stores, gas stations, grocery stores, and health clubs in the Los Angeles area.  Defense Exhibit ("DX") 7 (an October 14, 2004 royalty report prepared by plaintiff).  By spring of 2005, plaintiff's marketing efforts resulted in positive media attention and expansion of its commercialization efforts to major retailers.  DX10 (an April 11, 2005 royalty report prepared by plaintiff).  By 2006, plaintiff also began selling its bars in commercial military exchanges, including the Army and Air Force Exchange Service ("AAFES").  DX21 (an April 14, 2006 royalty report prepared by plaintiff).  During this time, plaintiff also succeeded in selling its bars to major retailers such as CVS, GNC, and Amazon.  See DX348 at 9 (expert presentation of Mr. Joel Lesch).  Plaintiff's revenues during this time period neared $2 million.  PX85 at 5 (expert rebuttal report of Dr. Andrew Safir).  Plaintiff's total business expenses during this same three-year time period were about $3.75 million.[7]  PX85 at 5.

In 2005, plaintiff also requested that the CRADA be extended to ten or fifteen year renewing terms, rather than five.  PX12 (a June 2005 email from Mr. Christian D'Andrea to Mr. Darsch, requesting the extension).  This extension was never granted.  Plaintiff also obtained the trademark "Soldier Fuel," and plaintiff renamed its commercial energy

---

[7] Mr. Lesch, the government's damages expert, indicated that the parties do not dispute the underlying costs and revenue data, and that he was "fine with Dr. Safir's model as . . . what the total costs are . . ."  Tr. 1212 (Joel Lesch).

bars "HooAH! Soldier Fuel" for most of the CRADA period.  See Tr. 85 (Christian

D'Andrea).

Plaintiff also began to explore trademarking the name "OORAH," the Marine

Corps battle cry.  Joint Stipulations of Fact ¶ 2, ECF No. 118.  The name "OOH-RAH!"

was being used on ration energy bars at that time, so that the military's ration energy bars

were being called "HooAH!/OOH-RAH!" bars.  See JX7.  The evidence established that

the use of the word "OOH-RAH!" in addition to "HooAH!" on the MRE energy bars was

meant to accommodate the Marine Corps, which objected to the sole use of "HooAH!"—

the Army's battle cry—on the military energy bars.  JX7 (an April 18, 2007 email from

Mr. Darsch indicating that the "sole use of HooAH on the energy bar [in the rations] is

something the [Marine Corps] would strongly prefer not to use"); PX20 (a December 18,

2006 email from Mr. Darsch); Tr. 696-97 (Gerald Darsch).

Mr. Christian D'Andrea testified that he discussed the possibility of trademarking

"OORAH," along with other military-themed trademarks, with Mr. Darsch and Ms.

Evangelos.  Tr. 58-59, 232 (Christian D'Andrea).  Mr. Christian D'Andrea testified that

Mr. Darsch was supportive of his efforts.  Tr. 232 (Christian D'Andrea).[8]

### 2.    Testing of plaintiff's commercial HooAH! bar during this period.

Early in 2006, plaintiff independently tested its bar for quality with its co-packer,

Nellson Neutraceutical, which helped plaintiff produce and develop new versions of the

---

[8] Mr. Darsch could not recall these conversations.  Tr. 312-13 (Gerald Darsch).  Ms. Evangelos recalls having a meeting about trademarks, but could not recall the specific trademarks that were discussed.  Tr. 456 (Kathy Evangelos).

HooAH! bar.  Tr. 55 (Christian D'Andrea).  In 2006, plaintiff was also in communication

with Lieutenant Colonel Sonia Corum, a research dietician at the U.S. Army Training and

Doctrine Command ("TRADOC").  Tr. 83 (Christian D'Andrea).  Lt. Col. Corum

conducted an evaluation of plaintiff's new trans-fat free HooAH! bar formulation on

basic training recruits at Fort Jackson, with positive results for plaintiff.  Tr. 83 (Christian

D'Andrea); see DX130 at 6 (referencing Lt. Col. Corum's study).

Natick also conducted a technical evaluation of the peanut butter HooAH! bar

around this time, a flavor that was initially developed by plaintiff in 2005.  Tr. 175

(Christian D'Andrea); DX22 (a July 14, 2006 royalty report prepared by plaintiff); JX15

(an email from Ms. Evangelous to Mr. Christian D'Andrea discussing the technical

evaluation).  Plaintiff's bar was rated "higher than the two [other] commercial brands"

included in this technical evaluation.  JX15 at 2.

In 2005, plaintiff endeavored to enter the military rations market but was not

successful in securing the award of a solicitation for ration energy bar components issued

by the Defense Supply Center, Philadelphia ("DSCP"), now called Defense Logistics

Agency Troop Support ("DLA Troop Support"). [9]  PX37 (a June 2007 email from Mr.

Darsch stating plaintiff "bid on contracts let by DSCP for an energy bar, however they

were not successful in receiving the award").  As a preliminary step in the procurement

---

[9] As this court explained in its prior summary judgment decision, the parties agree on the basic
structure of the military's acquisition process for purchasing food used for troop feeding.
D'Andrea, 96 Fed. Cl. at 212.  In the case of MRE rations, the military enters into contracts with
MRE assemblers through DSCP.  Id.  These assemblers may procure name brand or non-name
brand items, or produce food items themselves.  Id.  Rations are procured pursuant to the Federal
Acquisition Regulations.  Id.

process, Natick evaluated a product demonstration model ("PDM") of the HooAH! bar,
submitted in accordance with the solicitation.  Natick, as part of the procurement process
for ration components, analyzed the PDM to ensure that it met the military's specific
solicitation criteria for flavor, texture, odor, and appearance.  See Tr. 287 (Gerald
Darsch); Tr. 883 (Stephen Moody).  The results of Natick's evaluation of all of the PDMs
submitted were then provided to DSCP.  See Tr. 883 (Stephen Moody).  DSCP, not
Natick, is responsible for considering this evaluation and other factors, and for selecting
which companies will manufacture or assemble ration components.  Tr. 883 (Stephen
Moody).

### C.   The "OORAH" Trademark Issue and Termination of the CRADA

As noted above, in 2005, plaintiff began to explore the possibility of also
trademarking "OORAH," the Marine Corps battle cry.  Joint Stipulations of Fact ¶ 2,
ECF No. 118.  Plaintiff secured the "OORAH" trademark on November 7, 2006.  Id.

At that time, other private companies that pursuant to DSCP solicitations were
supplying energy bars to the military's operational rations, were using the words
"HooAH!/OOH-RAH!" on their MRE energy bars.  Tr. 63 (Christian D'Andrea).  On
November 17, 2006, plaintiff alerted DSCP that the use of "OOH-RAH!" on these bars
by these companies without payment violated plaintiff's "OORAH" trademark.  JX3.

Without informing plaintiff, Natick stopped promoting plaintiff's HooAH! bar at
military events:  on December 14, 2006, Ms. Evangelos sent an email to her staff,
instructing them to "[c]ease and desist from distributing D'Andrea HooAH Bars, HooAH
beverage and HooAH/OOH-RAH bars until further notice.  Trademark/licensing issues

ongoing." JX4.  On December 20, 2006, Mr. Philip Brandler, Director of Natick, sent a letter to plaintiff more than two years in advance of the end of the five-year CRADA term, stating that Natick would be terminating the CRADA at the end of its five-year term on January 14, 2009, and that the CRADA would not be renewed.  See JX6.  Prior to receiving the termination notice, plaintiff engaged in some limited discussion with Natick regarding the trademark issue.  JX5 (a December 12, 2006 email forwarding a November 22, 2006 email to Mr. Darsch and Ms. Evangelos, and stating,"We notified DSCP that we would have been open to giving them a free license to OORAH® for MREs, but that such a move is unreasonable, since if we did so, we would be the only ones contributing something to MREs for free . . . .").

### D.     The End of the CRADA Period: 2007-2009

After the termination letter was sent, and in the period between January 2007 and September 2007, the evidence established that plaintiff could not communicate with the persons in charge of the CRADA at Natick.  Starting in April 2007, plaintiff, believing that it had been wronged by the government, stopped making any royalty payments under the CRADA.  Tr. 108 (Christian D'Andrea).

### 1.     Plaintiff's emails to the military feeding community.

Starting in the spring of 2007, after learning that the CRADA would not be renewed, plaintiff sent out several emails to individuals in the military that played some role in military feeding, seeking to promote plaintiff's reformulated commercial bar to the military feeding community.  Plaintiff contacted, among others, Chief Jack Van Zanten and Ms. Loraine Salerno at the Army Center for Excellence in Subsistence

14

("ACES"), Dr. Daniel Johnston, a doctor from the Consortium for Health and Military

Performance ("CHAMP") at the Uniformed Services University of Health Services

("USUHS"), and Deputy Assistant Secretary of Defense for Force Health Protection and

Readiness Ellen Embrey.  See Tr. 79 (Chrisitan D'Andrea); PX41 at 3-4; PX51 at 3.  In

these emails, plaintiff attached or provided a link to documents promoting the HooAH!

Soldier Fuel bar.  DX61; DX130.  The emails and documents referenced the technical

evaluation of the peanut butter HooAH! bar conducted by Natick in 2006, the test run at

Fort Jackson by Lt. Col. Corum in 2006, and a test independently requested by plaintiff

and run by Covance, an analytic nutracuetical testing facility.  PX41 at 3 (an August 15,

2007 email from Christian D'Andrea to Mr. Darsch, Ms. Evangelos, and others, stating

"SoldierFuel [plaintiff's bar] is certified with 3 years of shelf-life by Covance Labs");

DX130.

   Plaintiff's emails to the members of the military feeding community touted the

"superiority" of plaintiff's bar over Natick's bar used in military rations.  See, e.g., PX51

at 3 (a September 2007 email from Mr. Chrisitan D'Andrea to Deputy Assistant Ellen

Embry, stating that "[w]e have succeded in creating the best performance nutrition bar for

the Warfighter . . . but Natick and DSCP are not adopting it.  They are instead sticking

with the inferior (and old) Hooah/First Strike[10] bar."); PX41 at 3 (an August 15, 2007

email from Christian D'Andrea stating, among other claims, "SoldierFuel [plaintiff's bar]

is all natural.  Hooah/First Strike is not all-natural").  As a result, the emails generated

---

[10] As described below, Natick eventually changed the name of its rations bar from
"HooAH/OOH-RAH!" to "First Strike."  See infra Part I.D.2.

inquiries from the military feeding community to Natick regarding the alleged superiority of plaintiff's energy bar as compared to Natick's rations bar, by then called "First Strike." Natick's response to these emails reflected Natick's defense of its own rations bar over plaintiff's. Natick also began a series of tests on plaintiff's bar and its own bar. Among the studies Natick undertook was an evaluation of plaintiff's Soldier Fuel HooAH! bar and Natick's rations bar in late 2007 on soldiers at Fort Polk, Louisiana ("the Fort Polk test"). Tr. 113 (Christian D'Andrea); DX179 at 2-4 (the results of the Fort Polk test). The Fort Polk test ranked plaintiff's bar ahead of Natick's in certain categories, but ranked the First Strike bar over plaintiff's in others, and found no statistical difference between the two bars. DX125 at 16-19; DX186 at 2.

In September 2007, after nearly nine months, plaintiff was finally able to reach Mr. Darsch, and a meeting was planned for October 17, 2007. DX127. On October 17, 2007, Mr. Paul D'Andrea, on behalf of plaintiff, met with representatives of Natick to discuss the future of the CRADA. See JX14. Various test results conducted by Natick on plaintiff's bar were shared with plaintiff at the meeting. See DX143 (an October 23, 2007 email from Mr. Paul D'Andrea to Mr. Darsch requesting a copy of those documents). Following the meeting, on October 30, 2007, Mr. Christian D'Andrea sent an email to Mr. Darsch, Ms. Evangelos, Chief Van Zanten, and military personnel at DSCP, Natick, ACES, TRADOC, and other entities involved in military feeding. DX152. This email requested that plaintiff's commercial Soldier Fuel bar be considered at the yearly Joint Services Operation Rations Forum, the military forum that considers proposed changes to operational rations, and stated "[w]e are thrilled that Natick Labs'

16

own science confirms that the D'Andrea Brothers LLC energy bar is superior."  DX152

(Mr. Christian D'Andrea's October 30, 2007 email).

Mr. Darsch responded on October 31, 2007, indicating that in order to be

considered for operational rations, plaintiff's commercial bar would have to pass initial

storage stability tests, and then would "be evaluated, as are all potential ration component

candidates, with Warfighters using a scientifically based, experimentally designed field

test," and would then undergo long term storage testing.  DX152 at 2.  Mr. Darsch also

explained that all ration components must be solicited competitively by DSCP.  DX152 at

2.  Mr. Darsch finally cautioned against asserting that Natick had agreed that the Soldier

Fuel bar was superior to the military bar, which Mr. Darsch wrote "is certainly untrue."

DX152 at 2.  As part of its obligations under the CRADA, in February 2008, a sensory

evaluation storage test was also conducted on plaintiff's energy bars.  Tr. 914 (Stephen

Moody); DX180 at 2 (a summary of this test).

### 2. The decision to change the name of the military HooAH! bar and the end of the CRADA period.

During this period of silence between Natick and plaintiff, and as plaintiff began

to reach out to members of the military feeding community, Natick decided to change the

name of its military rations bar.  In April of 2007, Mr. Darsch, although knowing there

were nearly two years remaining on the CRADA that he was overseeing, suggested

changing the name of the military's energy bar from "HooAH!" to "First Strike."  JX7.

In order to accommodate the Marine Corps and eliminate the "OORAH" trademark issue

with plaintiff, this change was implemented.  See Tr. 813 (Gerald Darsch); JX7; Tr. 471,

481 (Kathy Evangelos).  Plaintiff contends that the name-change decision while the CRADA was still in effect breached a core component of the CRADA bargain, which was to promote the HooAH! bar as the military's bar in the commercial market for a five-year period.

Upon learning of Natick's decision to end the CRADA, plaintiff also transitioned from using the HooAH! trademarks on its commercial bars around late 2007.  Tr. 565-66 (Mark D'Andrea).  Plaintiff eventually discontinued using the HooAH! trademarks in 2008, and began just using the "Soldier Fuel" brand name on its bars and other products. Tr. 238 (Christian D'Andrea).  The CRADA, and plaintiff's license to use the HooAH! trademarks, terminated in January 2009.

### E.    Plaintiff's Business Plan, Sales, and Royalty Payments

Plaintiff's business plan, presented to Natick during the negotiations that eventually lead to the formation of the CRADA, outlined an ambitious commercial market strategic plan.  Plaintiff stated in their strategic plan that "[t]he Company's intent is to grow the Hooah bar into one of the country's top four energy bars within five years." PX2 at 3.  Plaintiff experienced some initial success in its commercialization efforts.  In October 2004 until April 2006, plaintiff's semi-annual gross sales from HooAH! bars and, eventually, HooAH!-related products increased from $10,319, DX7, to $850,417, as reported on April 14, 2006, DX21.  Mr. Mark D'Andrea explained that this large increase in sales was attributable to the initial stock orders plaintiff received from some of the larger retailers.  Tr. 593 (Mark D'Andrea).

18

Even in this early period, however, plaintiff experienced brand recognition issues. In its early royalty reports, plaintiff explained that in some stores, the HooAH! bars' "lack of name recognition slows initial sales.  Supplementary marketing may be required."  DX7 (an October 14, 2004 royalty report prepared by plaintiff).  Mr. Mark D'Andrea testified that brand recognition was a major task for plaintiff under the CRADA, and that plaintiff realized it could take ten years or more, and millions of dollars, to successfully launch a new brand.  Tr. 560-62 (Mark D'Andrea).  During this early period of the CRADA, plaintiff in fact requested that the CRADA be extended to ten or fifteen year renewing terms, rather than five.  PX12 (a June 2005 email from Christian D'Andrea to Mr. Darsch, requesting the extension).  This extension was never granted.

Despite initial successes, starting in October 2006, plaintiff's gross sales significantly decreased to $467,794, DX24, when resale orders did not arrive.  See DX229, Att. 32 (summary of plaintiff's energy bar revenues by year by customer).  Plaintiff stated in its royalty reports that brand recognition remained a problem:

> It is difficult to introduce the public at large to the word and phenomenon of "HOOAH." . . . [H]aving succeded in the difficult task of getting HOOAH bars on the shelves of large retailers such as Wal-Mart and Albertsons, D'Andrea is finding that many customers have never heard of the word "HOOAH" and have never heard of the HOOAH bar, and therefore introducing them to the phenomenon is more challenging and time-consuming.

DX24 at 2 (an October 14, 2006 royalty report prepared by plaintiff); Tr. 185-86 (Mr. Mr. Christian D'Andrea stating, "[W]e were getting feedback from some retailers that that word, 'HOOAH,' was not understood immediately by consumers . . . We were

finding that the word . . . didn't have perhaps as much currency in the broader civilan marketplace as we thought.").

After October 2006, plaintiff's sales continued to decrease until the end of the CRADA period.  Plaintiff's revenues in 2007 were approximately $394,000, and in 2008, approximately $241,000.  PX85 (expert report of Dr. Andrew Safir).  In its January 14, 2007 report to Natick on the progress of work under the CRADA, plaintiff explained:

> The goal is to turn the HOOAH! bar into a major energy bar brand in the commercial market.  The challenges are real, as there was absolutely zero commercial awareness of or interest in the HOOAH! bar brand prior to D'Andrea's involvement.  Building a brand from zero is a huge task – it's something that even large multinational corporations often fail at.

DX42.  Despite its initial goal of becoming a top four energy bar in five years, by the end of the CRADA, the commercial HooAH! bars failed to even achieve a 1% market share. DX348 at 12 (expert damages presentation of Mr. Joel Lesch).

As noted above, plaintiff did not make any royalty payments to Natick after October 2006.  DX172 (a January 15, 2008 letter from Natick to plaintiff requesting payment).  Under the CRADA, plaintiff agreed to pay a minimum of $20,000 for the use of the HooAH! trademarks for these last two years.  The government in its counterclaim case seeks the royalty payments from 2007 to 2009 plus interest.  The government's counterclaim is discussed in Part III below.

## II.    BREACH: FINDINGS AND CONCLUSIONS

At trial, plaintiff presented testimony and evidence from five liability witnesses: Mr. Christian D'Andrea, Mr. Gerald Darsch, Mr. Mark D'Andrea, Ms. Kathy Evangelos, Ms. Loraine Salerno, and one damages expert, Dr. Andrew Safir.  Through the testimony

and exhibits introduced through the liability witnesses, plaintiff sought to establish that the government breached the implied covenant of good faith and fair dealing inherent in the CRADA by unreasonably failing to communicate with plaintiff from January 2007 to September 2007, by changing the name of its military energy bar from "HooAH!" to "First Strike" during the CRADA period, and by "bad mouthing" and electing to compete with plaintiff by developing its own bar within the military feeding community. Plaintiff sought to establish reliance damages in the amount of $1.95 million through Dr. Safir's testimony. This amount was derived from plaintiff's records and represented the difference between plaintiff's costs and revenues during the CRADA period.

The government presented testimony and exhibits from twelve witnesses, including most of plaintiff's witnesses, responding to plaintiff's liability and damages claim, as well as providing evidence in support of its counterclaim: Mr. Christian D'Andrea, Mr. Gerald Darsch, Mr. Mark D'Andrea, Ms. Kathy Evangelos, Mr. Stephen Moody, Chief Jack Van Zanten, Ms. Marye Carr, Mr. William Wood, Mr. Alan Wright, Mr. Jeffrey DiTullio, Mr. Joel Lesch, the government's damages expert, and Dr. Bradley Reiff, the government's rebuttal damages expert. The government's testimony and evidence was intended to demonstrate that the government's actions did not so unreasonably frustrate the CRADA so as to rise to the level of a breach of the implied covenant of good faith and fair dealing. The government also introduced evidence to show that plaintiff's damages were not the result of any of the government's actions under the CRADA. Rather, the government's witnesses testified that plaintiff would have sustained the losses identified as damages regardless of whether the government

breached the CRADA.  According to the government, plaintiff had over-estimated the

market value of the HooAH! name and was simply unable, in the five-year period

guaranteed by the CRADA, to successfully establish the bar in the commercial market.

Finally, the government presented evidence to show that plaintiff failed to comply with

the royalty provisions of the CRADA for the fourth and fifth year of that agreement, and

as a result owed the government a total of $59,294.72, representing the royalty payments

due plus interest.

Set forth below is a discussion of the court's findings and conclusions as to the

alleged breaches as well as the court's findings and conclusions regarding the

government's counterclaim and plaintiff's damages.

### A.      Breach of the Implied Covenant of Good Faith and Fair Dealing

Inherent in every contract is a duty of good faith and fair dealing.  Centex Corp. v.

United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  This duty applies to the United

States as it does to any other party, First Nationwide Bank v. United States, 431 F.3d

1342, 1349 (Fed. Cir. 2005), and includes a duty to cooperate and a duty not to hinder

another party's performance of the contract.  Scott Timber Co. v. United States, 692 F.3d

1365, 1372 n.2 (Fed. Cir. 2012).  The implied covenant of good faith and fair dealing

guarantees that the government will "not . . . interfere with the other party's performance

and not . . . act so as to destroy the reasonable expectations of the other party regarding

the fruits of the contract."  Centex Corp., 395 F.3d at 1304 (citations omitted); see also

First Nationwide Bank, 431 F.3d at 1350 ("The covenant of good faith and fair dealing

requires a party to respect and implement the contract in accordance with its terms . . . .").

However, "[n]ot all misbehavior . . . breaches the implied duty of good faith and fair dealing owed to other parties to a contract." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 829 (Fed. Cir. 2010) (citing First Nationwide Bank, 431 F.3d at 1350). The implied covenant is breached when the government unreasonably fails to cooperate in the other party's performance, Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988), or commits "'actions that unreasonably cause delay or hindrance to contract performance.'" H & S Mfg., Inc. v. United States, 66 Fed. Cl. 301, 311 (2005) (quoting C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1542 (Fed. Cir. 1993)); see also Scott Timber Co. v. United States, 333 F.3d 1358, 1368 (Fed. Cir. 2003). The covenant also imposes obligations of diligence and forthrightness, and a breach of these obligations is a contractual breach. Malone, 849 F.2d at 1445-46 (holding that where a contracting officer's "evasive conduct misled [plaintiff] to perform roughly 70% of its contractual obligation," the issue of a breach of good faith and fair dealing was invoked); San Carlos Irrigation and Drainage Dist. v. United States, 84 Fed. Cl. 786, 803 (2008) (citation omitted).

This question of reasonableness depends on the contract, its context, and the surrounding circumstances. Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. 598, 675 (2011) (citing C. Sanchez & Son, 6 F.3d at 1542; Commerce Int'l Co. v. United States, 338 F.2d 81, 86 (Ct. Cl. 1964)) (holding that the government breaches the duty not to hinder and the duty to cooperate when it "acts unreasonably under the circumstances, viz., if it unreasonably delays the contractor or unreasonably fails to cooperate"). "Although the implied covenant of good faith and fair dealing cannot be used to expand a

party's contractual duties beyond those in its express contract, the object of the contract is presumed to be subject to the covenant of good faith and fair dealing and the exact prohibited conduct need not be expressed."  Rivera Agredano v. United States, 70 Fed. Cl. 564, 574 (2006) (citing Centex Corp., 395 F.3d at 1306).[11]

For the reasons discussed below in detail, the court finds that the government breached the covenant of good faith and fair dealing when it failed to communicate with plaintiff for eight months starting in January 2007, and during this same period decided to stop using the HooAH! name anywhere on the military's rations bars without consulting plaintiff.  Thus, for an eight-month period, plaintiff was in the dark as to how the parties

---

[11] The Federal Circuit has also established a narrower standard to determine whether the government has breached the implied covenant of good faith and fair dealing, in the context of analyzing whether the United States Forest Service breached the implied covenant when it prolonged the suspension of timber harvesting contracts to comply with a court order that directed the Forest Service to comply with the Endangered Species Act.  Precision Pine, 596 F.3d at 828.  In that context, the Federal Circuit defined the standard for breach under the implied covenant as follows:  "The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract."  Id. at 829 (citing Centex Corp., 395 F.3d at 1311).  The Federal Circuit held that the Forest Service did not breach its implied duty because its actions "were (1) not 'specifically targeted ,' and (2) did not reappropriate any 'benefit' guaranteed by the contracts, since the contracts contained no guarantee that . . . performance would proceed uninterrupted."  Id.

The court in this case will analyze plaintiff's claims, as both parties urge, under the "reasonableness" standard articulated in the above text, because the government's actions that allegedly breached the implied covenant of good faith and fair dealing arose in relation to the government's relationship with plaintiff under the CRADA.  While the court originally applied the Precision Pine standard in its summary judgment opinion, the court notes that the Federal Circuit has since suggested that the Precision Pine standard applies to the specific facts of that case, which are not analogous to the situation before the court.  See Scott Timber, 692 F.3d at 1375 n.4; see also Fireman's Fund, 92 Fed. Cl. at 677 ("Precision Pine's two-part test for whether the Government breaches the implied duty of good faith and fair dealing must be read in this particular context, a situation where the Government's alleged wrongful conduct does not arise directly out of the contract, i.e., key to the alleged breach are actions involving another government actor or a third party.") (citation omitted).

were to work together cooperatively for the remaining term in order to commercialize the

HooAH! bar under the CRADA.  Plaintiff also lost the presence of the HooAH! name in

military rations bars during the CRADA period, a name that it had bargained for and was

a critical component to its commercialization efforts.

> **B.     Lack of Communication and Name Change**
>
> **1.     Summary of the evidence.**

Plaintiff presented evidence to demonstrate that the government breached the

implied covenant of good faith and fair dealing inherent in the CRADA by failing to

communicate with plaintiff from January 2007 to September 2007.  Plaintiff presented

testimony from Mr. Christian D'Andrea and Mr. Mark D'Andrea, who testified that they

could not communicate with Natick during that time period.  Mr. Christian D'Andrea

testified that from January 2007 to September 2007, he did not hear from Ms. Evangelos,

Mr. Darsch, or Mr. Brandler.  Tr. 70-71 (Christian D'Andrea).  Mr. Mark D'Andrea also

testified as to Natick's silence.  Tr. 570 (Mark D'Andrea) ("We find out that our partner

is not talking to us, won't return calls, won't return emails . . .").  As a result, Mr.

Christian D'Andrea testified, "You can't commercialize a product if you don't know

what your foundation with that product is and you don't know why your

commercialization partner is doing what they're doing, i.e., staying silent."  Tr. 78

(Christian D'Andrea).  Mr. Christian D'Andrea also testified that this lack of

communication impaired plaintiff's ability to sell its product and conduct marketing

events.  Tr. 128-29 (Christian D'Andrea) ("For nine months we were in a position where

if we wanted to talk to any retailer . . . we would be crucified to say . . . we can't actually

get our partner on the phone anymore, the ones who we have to deal with.  We don't know what's happening.  The trademark will probably go away in '09, but maybe sooner. . . . We can't even do marketing events.").

Plaintiff also presented documentary evidence in support of its contention that Natick had stopped communicating with it.  Plaintiff introduced notes from a 2007 meeting between plaintiff and representatives of ACES, which indicated that plaintiff "ha[d] not been able to speak to anyone at Natick."  DX89.  Plaintiff also presented an email from Mr. Christian D'Andrea to Mr. Darsch dated October 3, 2007, in which Mr. Christian D'Andrea states, "I think we got derailed by a lack of communication.  To be honest with you, we felt kind of betrayed mostly by the radio silence."  PX59.  Plaintiff further presented evidence that this "radio silence" was discussed at the October 17, 2007 meeting between Natick and Mr. Paul D'Andrea.  JX14 at 4 (meeting notes, indicating that Mr. Paul D'Andrea had said "when you get no response, we work with the truth - get the truth out[.]  8 months is a huge deal for a private company.").  These meeting notes indicated that Mr. Darsch himself recognized the period of silence and at the meeting said he would "take some of the hit" as to the silence.  JX14 at 16.  Plaintiff also presented evidence that after the October 17, 2007 meeting, Mr. Darsch sent an email to various personnel asking them to "not respond to any calls/emails from the D'Andrea Brothers," apparently because he disagreed with Mr. Christian D'Andrea's email claiming plaintiff's bar was superior to Natick's bar.  PX63.

The government, in response, contends that the evidence establishes that the eight month period of silence was reasonable and did not unreasonably interfere with the

contractual performance of plaintiff.  The government also presented evidence to show that it did have some communications with plaintiff during this period.  In support, the government presented the testimony of Mr. Darsch, who testified that he believed that he communicated "effectively and honestly" with plaintiff throughout the CRADA period.[12] See Tr. 278-79 (Gerald Darsch). Mr. Darsch testified that he was surprised and betrayed upon learning that plaintiff had contacted Dr. Johnston and other members of the military feeding community without his knowledge, and that he felt the need to be cautious after learning about that communication.  Tr. 280, 352 (Gerald Darsch).

Mr. Darsch further testified that, to the extent Natick stopped communicating with plaintiff, there were reasons for the so-called "radio silence," connected with the "OORAH" trademark issue.  JX14 at 16 (meeting notes from the October 17, 2007 meeting between plaintiff and Natick indicating "[c]ompelling reasons for radio silence"); Tr. 348 (Mr. Darsch testifying, "I was advised by higher authorities not to engage in conversation, discussion or email until the issues were resolved.").  Ms. Evangelos also testified that she sent the "cease and desist" email to her team, JX4, not to frustrate the CRADA, but because of the "OORAH" trademark issues and at the direction of "higher authorities."  Tr. 465-67 (Kathy Evangelos).

The government also presented evidence that Natick in fact had communicated with plaintiff during this period.  The government introduced evidence of calls and emails

---

[12] The court finds that Mr. Darsch's testimony on this and other issues, such as Natick's involvement with plaintiff's trademarking of "OORAH," was inconsistent with the contemporaneous emails and later testimonial evidence, and that these inconsistencies diminished Mr. Darsch's credibility.

between Mr. Jeffrey DiTullio, a Technology Transfer Manager at Natick, Tr. 1086

(Jeffrey DiTullio), and plaintiff.  Mr. DiTullio testified that he communicated with Mr.

Christian D'Andrea by phone in June of 2007 regarding plaintiff's failure to make its

April royalty payment.  Tr. 1086-87 (Jeffrey DiTullio).  Mr. DiTullio also emailed with

Mr. Christian D'Andrea.  In his emails, Mr. DiTullio requested payment of the royalties

owed to Natick under the CRADA.  Tr. 1089 (Jeffrey DiTullio).  In a response email to

Mr. DiTullio, Mr. Christian D'Andrea requested that Natick provide semi-annual

progress reports, as required by the CRADA, which Natick had failed to produce up to

that point.  DX176.  The government further introduced, as evidence of communication,

Natick's response to FOIA requests initiated by plaintiff in August of 2007, which

plaintiff initiated because Natick had stopped communicating with it under the CRADA.

See DX85 (an August 2007 email from Christian D'Andrea requesting documents

relating to Natick's testing of the HooAH!/First Strike bar).

The evidence introduced by plaintiff also established that in April 2007, during

this period of "radio silence," Natick, without regard to plaintiff's license and without

communicating with plaintiff, decided to change the name of the military's rations bar to

"First Strike," removing all references to "HooAH!."  As discussed above, Mr. Darsch,

plaintiff's key contact at Natick, was the person who suggested that the name of the

military rations bar, then "HooAH!/OOH-RAH!," be changed to "First Strike."  His

recommendation to abandon the HooAH! name was eventually implemented.  Tr. 471

(Kathy Evangelos).

Plaintiff presented unrefuted evidence that the commercial bar's military pedigree was central to its commercialization efforts, and that, in changing the name of the bar and removing the HooAH! name from military rations, Natick completely undermined those efforts. Specifically, plaintiff presented evidence that it was the parties' intention that under their agreement, the commercial and military HooAH! bar would have the same name. Mr. Christian D'Andrea testified that the identical names were "the centerpiece of our CRADA." Tr. 154 (Christian D'Andrea). Indeed, Mr. Darsch agreed that, under the CRADA, "[Natick's] goal was that we would give [soldiers] the same thing in both the commercial sector and in the private sector." Tr. 274 (Gerald Darsch).

Mr. Christian and Mr. Mark D'Andrea further presented evidence to show that the reason the parties intended for the military and commercial product to be similar was something called the "Skittles effect," which, to be successful, relied on the commercial and military rations bar having the same name. As Mr. Christian D'Andrea explained, the Skittles effect is a "morale-boosting effect that makes the soldier feel good [when they see a recognizable product in their rations] because they feel like I'm not so far from home." Tr. 23 (Christian D'Andrea). Mr. Mark D'Andrea testified that name similarity between the military and the commercial bar was also critical for branding and commercialization, and that the abandonment of the HooAH! name completely undermined plaintiff's commercialization efforts: "We find out that our partner . . . has changed the name to First Strike. I mean you can't do anything more to limit the availability of the HooAH! bar and the HooAH! brand that we had been working so assiduously since 2004 to create than that action." Tr. 570 (Mark D'Andrea). The lack

of communication coupled with the name change essentially ended plaintiff's hopes of building a HooAH! brand.  In response, as outlined above, plaintiff turned its efforts to building support for their Soldier Fuel bars and to find customers within the military feeding community.

The government presented testimony from Mr. Darsch and Ms. Evangelos in an effort to show that the government acted reasonably in changing the name of the military bar to "First Strike" because of the actions of plaintiff regarding the "OORAH" trademark issue.  As discussed above, in 2006, the name of the military rations bar was changed from simply "HooAH!" to "HooAH!/OOH-RAH!" because of objections by the Marine Corps.  After registering the "OORAH" trademark, on November 17, 2006, plaintiff alerted DSCP that it was possible that the use of "OOH-RAH!" by the companies that were manufacturing the military rations bars violated the law.  JX3.

The evidence presented showed that plaintiff proposed that it would consider granting a free license to the military to use "OOH-RAH!" for operational rations, if products bearing "OOH-RAH!" were produced by DSCP itself rather than other food manufacturing companies.  JX5 (a November 22, 2006 email from Christian D'Andrea to members of DSCP).  In the alternative, plaintiff proposed a licensing fee of fifteen cents for each bar that used the "OORAH" trademark in the MREs.  Tr. 325 (Gerald Darsch).  Mr. Darsch testified that, because of the trademark issue and plaintiff's demands, he recommended the name of the HooAH! bar be changed to the First Strike bar, "something neutral that would appeal to all of the services."  Tr. 812-13 (Gerald Darsch) ("We knew we could not use the mark OOH-RAH!  The government would not pay for

30

that.  We had to take off HooAH! because the Marine Corps insisted on it. . . . We didn't want to just use a plain wrapper, so we decided that we would try to use something neutral that would appeal to all of the services."); JX7 (an April 18, 2007 email from Mr. Darsch).

The government also presented evidence to show that removing the HooAH! name from the military's bar could not have interfered with plaintiff's commercialization efforts because the military and the commercial HooAH! bars were different in many respects, and because the First Strike bar did not become available in rations until sometime in late summer of 2008, which was very close to the end of the CRADA period.  Tr. 1228-29 (Joel Lesch).  The government introduced evidence that plaintiff itself changed the name of some of its energy bars from HooAH! to Soldier Fuel in 2007, during the CRADA period, and transitioned away from the HooAH! brand before the end of the CRADA period.  Tr. 565-66 (Mark D'Andrea).

## 2.  Findings and Conclusions

Having considered all of the testimony and evidence presented, the court finds that, under this unique contract based on cooperation, Natick's failure to communicate with plaintiff between January 2007 and September 2007, as well as its decision to abandon the HooAH! name during this time period, breached the implied covenant of good faith and fair dealing inherent in the CRADA.  These combined reactions to the "OORAH" trademark issue by Natick amounted to an unreasonable failure to cooperate with plaintiff.

31

To begin, the testimony and documentary evidence demonstrated that plaintiff was not able to communicate with Mr. Darsch and Ms. Evangelos, its key contacts at Natick, from January 2007 to September 2007.  The evidence further established that Natick's decision not to communicate with plaintiff was purposeful and intentional and stemmed from a disagreement over the "OORAH" trademark that was outside the scope of the CRADA.  The court finds that this purposeful evasion, lasting for eight months, amounts to an unreasonable failure to cooperate under the CRADA, which contemplated that Natick and plaintiff would work together in order to increase the effectiveness and availability of the HooAH! bar.  See H & S Mfg., Inc., 66 Fed. Cl. at 310-11 (2005) ("Generally, a failure to cooperate with the other party in the performance of a contract serves as a breach of that contract because a failure to cooperate violates the duty of good faith." (citing Malone, 849 F.2d at 1445)).

The government contends that its evidence of plaintiff's own actions and Natick's response regarding the "OORAH" trademark issue shows that the lack of communication on the part of the government was reasonable.[13]  However, the court finds that the explanation offered by the government—that Natick remained silent because of pending trademark issues outside the scope of the CRADA and at the direction of "higher authorities"—does not absolve Natick from halting communications with and continuing to ignore plaintiff, particularly when Natick personnel knew of plaintiff's plans, in

---

[13] The court finds that plaintiff's and Natick's communications over the royalties do not qualify as communications to further the objectives of the CRADA.  Further, the royalty communications in fact revealed that Natick was not meeting its reporting obligations under the CRADA.

advance, to trademark the "OORAH" name and apparently never explained to plaintiff

the potential consequences of trademarking "OORAH."  In this regard, the court finds

that Mr. Darsch's contemporaneous acknowledgement of the decision not to

communicate with plaintiff telling.  Mr. Darsch, in 2007, acknowledged that he would

"take some of the hit" for the silence.  JX14 at 16.  The implied covenant of good faith

and fair dealing encompasses obligations of diligence, cooperation, and forthrightness,

and a breach of these obligations is a contractual breach.  See Malone, 849 F.2d at 1445-

46; San Carlos, 84 Fed. Cl. at 803.  The court finds that Natick's lack of cooperation and

forthrightness in its refusal to communicate with its CRADA partner for eight months

amounts to an unreasonable failure to cooperate under the circumstances.

 The court's finding of a breach of good faith and fair dealing is not based solely on

the government's purposeful decision to stop communicating with plaintiff, but is

coupled with the government's related decision during this same period to abandon the

HooAH! name, thereby undercutting the value of plaintiff's license to use the HooAH!

trademarks.  The evidence demonstrated that in April 2007, during the period of "radio

silence" between Natick and plaintiff, it was Mr. Darsch, the person responsible for the

CRADA at Natick, who decided on the name change.

 The evidence showed that both Mr. Christian D'Andrea and Mr. Darsch

understood that they intended the name to be the same on both the military and

commercial bars.  Mr. Christian D'Andrea testified that the identical names were "the

centerpiece of our CRADA."  Tr. 154 (Christian D'Andrea).  Mr. Darsch also testified

that, under the CRADA, "[Natick's] goal was that we would give [soldiers] the same

thing in both the commercial sector and in the private sector." Tr. 274 (Gerald Darsch). In addition to this intent, the stated objective of the CRADA itself demonstrates an understanding on the part of both parties that they would engage in cooperative research and development with the goal of "increased effectiveness (if possible) and availability of the HooAH! Energy Bar."  JX1 at 17.

In light of this goal and the parties' stated intent, the court finds that Natick's actions—its evasive behavior leading up to a decision to abandon the HooAH! name without discussions with plaintiff—"destroy[ed] the reasonable expectations of [plaintiff] regarding the fruits of [its] contract" with the government.  Centex Corp., 395 F.3d at 1304.  Namely, the government's actions destroyed plaintiff's reasonable expectation that the parties would work cooperatively to develop and commercialize the HooAH! energy bar that would be the same or similar to the bars available in military rations.  More specifically, Natick's decision to abandon the HooAH! name undermined a central aspect of the CRADA—the identical name shared by both parties' bar—that the parties identified as their intent and bargained for under the agreement.[14]

While the government generally avers that it had no choice but to ignore plaintiff and change the name of the bar because of the "OORAH" trademark issues, the evidence shows that the government completely failed to work with plaintiff regarding these issues.  In effect, after Natick made the decision not to renew the CRADA at the end of 2006, Natick treated the CRADA as if it were terminated right then.  The government's

---

[14] Indeed, the government's damages expert, Mr. Joel Lesch, testified, "So I understand the First Strike use and I think I probably even said in my deposition, it would be troubling to me if I'd been in their shoes and learned hey, you're going to change the name?"  Tr. 1229 (Joel Lesch).

complete disregard for the CRADA relationship, even though two years remained in the CRADA term, is unreasonable under the circumstances.

In sum, the government's actions unreasonably frustrated the intended objectives of the CRADA. The court finds that the government's unreasonable failure to cooperate combined with the government's decision to undermine the parties' stated intent under the CRADA breached the implied covenant of good faith and fair dealing. [15]

## III.   THE GOVERNMENT'S BREACH WAS A PRIOR MATERIAL BREACH

The court now turns to the government's counterclaim in this case for unpaid royalty payments. As noted, plaintiff did not make any royalty payments to Natick as required under the CRADA after 2006. See PX172 (a January 15, 2008 letter requesting payment). The parties do not dispute that plaintiff did not make royalty payments under the CRADA for 2007 and 2008. In addition, the parties do not dispute that $59,294.72 is owed under the CRADA for foregone royalty payments. However, the parties do dispute whether the government's breach of the implied covenant absolves plaintiff of its obligation to pay the royalty payments.

---

[15] Because the court finds that these activities amounted to a breach of the implied covenant of good faith and fair dealing, the court does not discuss plaintiff's additional claims of "bad mouthing" and competition that it alleges also comprise a breach. The court notes, however, that these actions taken alone would not likely rise to the level of a breach of good faith. Natick was not barred under the CRADA from developing its own rations bar, and, because it did not produce items for the commercial market, Natick simply could not compete with plaintiff in the commercial market. In addition, in reacting to the inquiries from the military feeding community generated by plaintiff's claims of its commercial bar's superiority, Natick only communicated internally with military personnel, not with commercial vendors in the commercial market. As such, Natick's "bad mouthing" and so-called competition with plaintiff would not have unreasonably hindered plaintiff's ability to commercialize the HooAH! bar under the CRADA, nor did it amount to a lack of cooperation that undermined the objectives of that agreement.

Whether the government may recover the foregone royalty payments depends on whether the government's breach of the CRADA was material and prior to plaintiff's breach.  A prior material breach excuses the non-breaching party from continuing performance.  Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1276 (Fed. Cir. 1999); Malone, 849 F.2d at 1446.  "A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract."  Thomas v. Dep't of Hous. & Urban Dev., 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 Arthur L. Corbin, Corbin on Contracts § 1104 (1964)).  Whether a particular breach is material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties."  Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1312 (Fed. Cir. 2004) (quoting Stone Forest Indus. Inc. v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992)).  A breach of the covenant of good faith and fair dealing can amount to a material breach that would excuse a party's duty to perform.  Malone, 849 F.2d at 1445-46.

Under the doctrine of prior material breach, "[u]pon a material breach of a contract the non-breaching party has the right to discontinue performance."  Stone Forest Indus., 973 F.2d at 1550.  When faced with a material breach, the non-breaching party may "1) entirely discontinue performance under the contract, 2) explicitly reserve its right to discontinue performance for the material breach, or 3) waive the right and continue performance under the contract."  Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 648 (2004).  Accordingly, a non-breaching party with knowledge of a material breach may not continue to perform under the contract and then assert a material breach;

36

instead, if a non-breaching party continues to perform, it may only obtain damages for a partial breach of the contract. Cities Serv. Helex, Inc. v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976); see Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1383 (Fed. Cir. 2004). Ignorance of a material breach does not preclude a party from relying on such a breach as justification for its failure to perform. Christopher Vill., LP v. United States, 53 Fed. Cl. 182, 189-90 (2002), aff'd, 360 F.3d 1319 (Fed. Cir. 2004) (quoting College Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925) ("A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact.")).

The court finds, in this case, that the combined actions of the government—its evasive behavior and failure to communicate with plaintiff starting in January 2007, which eventually led to its final decision to abandon the HooAH! name—materially breached the CRADA. As discussed above, the court finds that both parties agreed that their intent under the CRADA was that the commercial and military HooAH! bar would appear the same in military rations and in the commercial marketplace. This evidence established that keeping the same name between the commercial and military rations bar was a crucial part of the CRADA and was of vital importance to plaintiff in its commercialization efforts. The court thus concludes that the government's actions surrounding and including the decision to change the name of the military rations bar went to "the essence of the contract," and rose to the level of a material breach. Thomas, 124 F.3d at 1442.

37

The government argues that, even if the government materially breached the contract, plaintiff continued to perform under the CRADA by continuing to commercialize the HooAH! bar and by using the HooAH! trademarks, and therefore cannot assert a material breach claim. The court rejects this assertion. Plaintiff's communications with other members of the military feeding community shortly following the breach concerned the promotion of plaintiff's bar as a military ration component, an objective wholly outside of the CRADA. Moreover, plaintiff did not submit any further royalty payments or royalty reports under the CRADA after plaintiff realized that Natick had stopped communications. In addition, once plaintiff realized that the HooAH! name would be abandoned, plaintiff began to transition from the use of "HooAH!" to "Soldier Fuel" on its energy bars around October 2007, and moved completely away from "HooAH!" in 2008. The court thus finds that plaintiff, after refusing to pay its royalty payments, also stopped performing under the CRADA.

In addition, the court finds that the fact that plaintiff agreed to meet with Natick in October 2007 in an effort to re-establish the CRADA relationship did not amount to a waiver of its material breach claim. The evidence established that the October 17, 2007 meeting was unsuccessful in reviving the CRADA relationship between Natick and plaintiff. Indeed, the evidence showed that Natick did not communicate with plaintiff after that meeting for the purposes of forwarding the objectives of the CRADA. Subsequently, and before the end of the CRADA period, plaintiff filed the present lawsuit in 2008.

The evidence thus established that plaintiff ceased to perform under the CRADA and did not waive its material breach claim. Because the evasive behavior surrounding the name change began in early 2007, months before plaintiff's royalty payments were due under the CRADA in April 2007, this breach was a prior material breach.[16] As such, the government is not entitled to any payment on its counterclaim.

## IV.   THE GOVERNMENT HAS ESTABLISHED THAT PLAINTIFF WOULD HAVE SUSTAINED ITS LOSSES REGARDLESS OF THE BREACH.

The court now turns to the issue of plaintiff's damages claim. Plaintiff, deciding that a lost profits claim would be speculative, Tr. 640, 667 (Dr. Andrew Safir), sought to establish at trial that it is entitled to reliance damages. Reliance damages are used "to put the non-breaching party in 'as good a position as [it] would have been in had the contract not been made.'" Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1364 (Fed. Cir. 2005) (quoting Restatement (Second) of Contracts § 344(b)). Plaintiff seeks $1,946,039 in reliance damages, representing the total costs it incurred in performing under the CRADA, plus costs in transitioning from the HooAH! brand, less revenues earned. Tr. 642-44 (Dr. Andrew Safir); PX85 (expert rebuttal report of Dr. Andrew Safir).

The Federal Circuit has established a two-part procedure for measuring a non-breaching party's reliance damages. First, plaintiff must establish that its loss must have been foreseeable to the breaching party at the time of contract formation. Am. Capital

---

[16] In addition, although the evidence established that Mr. Darsch suggested changing the name of the military HooAH! bar to First Strike around the same time of plaintiff's first missed royalty payment, Natick discussed pulling the name "HooAH!" from the rations bar even earlier, in March 2007, before plaintiff was required to submit its April 2007 royalty payments to Natick. DX48 at 2.

Corp. v. FDIC, 472 F.3d 859, 867 (Fed. Cir. 2006) (quoting Landmark Land Co., Inc. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001)).  A loss may be foreseeable "'as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.'"  Am. Capital Corp., 472 F.3d at 867 (quoting Landmark, 256 F.3d at 1378).  In this case, the government does not dispute that plaintiff's damages, as reported by plaintiff's expert and representing the costs, not covered by revenues, that plaintiff incurred in performing under the CRADA, were reasonable and foreseeable by the government at the time of the formulation of the CRADA.  Nor does the government's damages expert dispute the expenditure and revenue data underlying the amount of reliance damages being claimed by plaintiff.[17] Through the testimony and plaintiff's evidence presented by Dr. Safir, plaintiff established that the difference between its costs and revenues for the CRADA period was $1,946,039, which is the amount it seeks in reliance damages.[18]

Whether plaintiff is entitled to these damages is another matter.  Under the second part of the Federal Circuit's test in determining reliance damages, once plaintiff has

---

[17] Mr. Lesch, the government's damages expert, indicated that the parties do not dispute the underlying costs and revenue data, and that he was "fine with Dr. Safir's model as . . . what the total costs are . . ." Tr. 1212 (Joel Lesch).  At trial, Mr. Lesch pointed out the "objectionable" expenditure for parking tickets, which plaintiff conceded should not be included in the damages claim, but which amount to only $3,760.  Tr. 1298; DX348 at 39.

[18] Mr. Lesch's revised expert report calculated a maximum of $1.76 million in damages.  DX229 at 6.  Dr. Safir's and Mr. Lesch's figures differ because the two experts relied on different sources for revenues and costs.  See DX342 at 15 (surrebuttal report of the government's damages expert Dr. Bradley Reiff).  As noted above, Mr. Lesch is willing to rely on Dr. Safir's calculations of total revenues and costs.  See supra note 17.

established that its reliance costs were foreseeable, the burden shifts to the breaching party to prove, with "reasonable certainty," "what expenditures would have been lost despite the breach." Am. Capital Corp., 472 F.3d at 869; see also Westfed Holdings, 407 F.3d at 1370 (citing Restatement (Second) of Contracts § 349).[19]

The latter half of the reliance damages test is derived from section 349 of the Restatement (Second) of the Law of Contracts.  Section 349 permits a reliance recovery to be offset by losses that would have been sustained had the contract been fully performed, if the breaching party can prove those losses with reasonable certainty. Restatement (Second) of Contracts § 349; see Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 155 (2002) (citing L. Albert & Son v. Armstrong Rubber Co., 178 F.2d 182, 189 (2d Cir. 1949) ("On principle therefore the proper solution would seem to be that the promisee may recover his outlay in preparation for the performance, subject to the privilege of the promisor to reduce it by as much as he can show that the promisee would have lost, if the contract had been performed.")).  As such, the Restatement caps reliance damages by requiring a plaintiff to bear any losses that it would have suffered had the breaching party fully performed.[20]  The Federal Circuit has adopted the Restatement's

---

[19] The Federal Circuit has also found that, in calculating reliance damages, a breaching party "may be credited with any benefit the plaintiff retained from its expenditure in reliance of the breached agreement." Westfed Holdings, 407 F.3d at 1370 (citing Dan B. Dobbs, Law of Remedies § 12.3(1) at 51-52 (2d ed. 1993)).

[20] Scholars have noted that the consideration of whether the non-breaching party would have suffered its losses regardless of the breach introduces an element of another type of damages theory—expectation damages.  The expectation theory measures damages as the benefits the non-breaching party would have received had the contract been performed.  The Restatement standard limits reliance damages based on this expectation principle by offsetting reliance damages with losses that would have occurred had the contract been performed. See Christopher

approach to reliance damages.  See Am. Capital Corp., 472 F.3d at 869; Westfed

Holdings, 407 F.3d at 1369-70.  In deciding whether a party's losses are "reasonably

certain," the court may "take into account all the circumstances of the breach."

Restatement (Second) of Contracts § 352.

The court finds that application of the Restatement's approach in this case yields

zero damages for plaintiff.  Although the court has found a breach on the part of the

government, plaintiff may not recover damages because, regardless of the government's

actions, it would have lost the value of its investment and would have been unable to

recoup its costs in any event.  Plaintiff may not use the government's breach to wipe

away bad or naive business decisions, where it alone is responsible for a miscalculated

risk concerning its own investment.  To find otherwise would allow plaintiff to recoup

losses that would have occurred even if the government had fully performed.  Therefore,

here, for the reasons that follow, the court finds that government has shown with

reasonable certainty that plaintiff would have lost its reliance costs regardless of the

government's lack of communication and Natick's decision to change the name of the

military bar to "First Strike," and plaintiff cannot recover.

---

T. Wonnell, The Phantom Reliance Interest in Contract Damages, 1992 Wis. L. Rev. 1775, 1783
(1992) ("[R]eliance scholars almost never support the pure reliance interest. They uniformly
deviate from the retrospective focus of the reliance interest in one class of cases: when the
plaintiff entered a bad contract with the defendant.  In those situations, they argue that the
expectation interest should serve as a limit on the plaintiff's recovery. . . . The arguments
favoring this approach have persuaded courts and scholars for over a century.").  As noted above,
the Federal Circuit has recognized this limitation on reliance damages. Am. Capital Corp., 472
F.3d at 869.  While plaintiff in this case advocates a pure reliance-based approach, which would
compensate plaintiff regardless of its losses in a no-breach world, the court adopts the
Restatement standard here.

To demonstrate that plaintiff's reliance costs were lost regardless of the government's actions, the government presented evidence that (1) plaintiff entered into the CRADA with Natick and made its investment knowing it could only count on using the HooAH! name for five years, a very limited period of time to recoup its investments; (2) plaintiff was, by its own admission, experiencing brand recognition problems before the breach and plaintiff's sales were substantially declining before the breach, and (3) plaintiff's post-breach losses in the commercial market for the remaining CRADA period were not attributable to the government's actions because First Strike bars were not introduced into military rations until the very last months of the CRADA period.  The court concludes that this evidence, taken together, demonstrates that even in a no-breach world, plaintiff would have been unable to recoup its investments and therefore would have suffered its losses despite the government's breach.

It is undisputed that, under the CRADA, any investment plaintiff put in the HooAH! brand had only a guaranteed five-year lifespan.  Upon entering into the agreement, plaintiff knew that Natick could terminate the CRADA as early as 2009, and does not dispute Natick's ability to do so.  Early in the CRADA period, plaintiff recognized the problems a five-year CRADA term placed on the success of its commercial bars and asked that the CRADA be extended to ten or fifteen year renewing terms, rather than five.  PX12.  The need for a ten to fifteen year period was discussed by Mr. Mark D'Andrea, who noted in his testimony that establishing a brand often takes ten years or more and often millions of dollars.  Tr. 560-62 (Mark D'Andrea).

By January 2007, plaintiff also knew that the five-year end date was a certainty because the CRADA had been unilaterally terminated by Natick.  Three years into its contract with Natick, therefore, plaintiff knew that it would have to transition away from the HooAH! brand by 2009, and that it would have only two remaining years to recoup its investment in the HooAH! energy bar.  By this time, plaintiff recognized that it was not succeeding in building the HooAH! brand.  Indeed, in a late 2006 royalty report to Natick, plaintiff stated:

> It is difficult to introduce the public at large to the word and phenomenon of "HOOAH." . . . [H]aving succeeded in the difficult task of getting HOOAH Bars on the shelves of large retailers such as Wal-Mart and Albertsons, D'Andrea is finding that many customers have never heard of the word "HOOAH" and have never heard of the HOOAH bar, and therefore introducing them to the phenomenon is more challenging and time-consuming.

DX24 at 2 (an October 14, 2006 royalty report prepared by plaintiff); Tr. 185-86 (Mr. Christian D'Andrea stating, "[W]e were getting feedback from some retailers that that word, 'HOOAH,' was not understood immediately by consumers . . . We were finding that the word . . . didn't have perhaps as much currency in the broader civilan marketplace as we thought.").  In its last report to Natick on the progress of work under the CRADA, plaintiff explained:

> The goal is to turn the HOOAH! bar into a major energy bar brand in the commercial market.  The challenges are real, as there was absolutely zero commercial awareness of or interest in the HOOAH! bar brand prior to D'Andrea's involvement.  <u>Building a brand from zero is a huge task – it's something that even large multinational corporations often fail at.</u>

DX42 at 3 (emphasis added).  Plaintiff's branding problems existed before the government's breach, and revealed that before the breach, plaintiff's investment in the

HooAH! brand had not turned out as planned.  Moreover, with only a five-year agreement, the evidence established that plaintiff was compelled to move away from the HooAH! name before the end of the CRADA period.  Tr. 577-78 (Mark D'Andrea) (stating that plaintiff "had to operate under the assumption that there's a very realistic chance we have to switch our brand over to Soldier Fuel").[21]  Plaintiff's own admissions thus established that it would be unable to recoup its investments it made in reliance on the CRADA in the two years following the termination letter, even before a breach had occurred.

The evidence of plaintiff's pre-breach sales data confirms that plaintiff would have suffered its losses despite the breach.  The evidence demonstrated that plaintiff's sales substantially declined during this pre-breach period.  Plaintiff's semi-annual gross sales from HooAH! bars and, eventually, HooAH!-related products increased to a high of $850,417, as reported in April 14, 2006.  DX21.  By October 2006, plaintiff's gross sales had significantly decreased to $467,794—before any breach of the CRADA.  DX24.  Given plaintiff's multi-million dollar investment, it was simply not possible for it to recoup those losses in the timeframe guaranteed under the CRADA.

Finally, the evidence established that the government's decision to abandon the HooAH! name, although it unreasonably undermined the parties' intent under the

---

[21] In addition, the evidence established that the cost incurred by plaintiff after the breach in 2007 and 2008 were not post-breach mitigation costs properly included in reliance damages, but costs that would have had to have been incurred by plaintiff to the extent it wanted to continue its business after January 2009 using a new name.  As noted above, plaintiff recognized that it had to transition away from the HooAH! name to the sole use of "Soldier Fuel" before the end of the CRADA period, and at the time of trial plaintiff continued to sell Soldier Fuel bars.  DX348 at 32.

CRADA and thus breached the implied covenant of good faith and fair dealing, had no

practical impact on plaintiff's declining sales in the commercial market.  The unrefuted

evidence established that, while Natick decided to change the name of the HooAH! bar to

"First Strike" in 2007, the HooAH! bar continued to appear in military rations until

nearly the end of the CRADA period in late 2008.  Tr. 1228 (Mr. Lesch testifying that

only "sometime potentially in the summer of '08 the [First Strike] bars have been

delivered to the government, the government has to get them over to the warfighters

overseas . . . and the government still has to use up their existing inventory of HooAH!

bars." ).  In other words, the First Strike bar appeared in military rations only shortly

before plaintiff lost its HooAH! license under the terms of the CRADA, and thus only

shortly before the usefulness of the HooAH! rations bar for plaintiff's sales came to an

end.  As such, the absence of HooAH! bars in military rations, occurring only at the very

end of the CRADA, could not have had any actual impact on the commercial market

during the CRADA period.  Nor could the absence of HooAH! bars in military rations a

few months before the CRADA expired impact the "Skittles effect" during the CRADA

period.

Taken together, the evidence showed that by the time of the breach in 2007,

plaintiff had less than two years remaining in the CRADA period within which to recoup

its investment, regardless of the breach.  At that time, plaintiff's efforts to commercialize

the HooAH! bar, by its own admissions, were failing, and plaintiff itself recognized that

it would need more time to recoup these losses and make the HooAH! brand successful.

In addition, the evidence established that the government's actions had little to no

practical impact on plaintiff's performance in the commercial market because HooAH!

bars remained available in military rations up until close to the end of the CRADA

period.  In short, the evidence established that plaintiff's losses sustained in

commercialization of the HooAH! brand were attributable to its own business decisions,

not the actions of the government.  While Natick unreasonably failed to cooperate with

plaintiff under the CRADA, the government cannot be held responsible for plaintiff's

decision to undertake a business venture that ultimately, regardless of the government's

actions, failed.  Plaintiff's goal of becoming the fourth most popular energy bar in five

years had failed, not because of the government's actions, but because plaintiff found it

impossible to build a brand within the limited time provided under the CRADA.

In light of the foregoing, the court finds that the evidence presented by the

government establishes, with reasonable certainty, that plaintiff would have lost its

reliance costs despite the breach.  The court therefore finds that the government has met

its burden under the second part of the Federal Circuit's test, and that plaintiff cannot

recover its claimed reliance damages.

## V.    CONCLUSION

Based on the foregoing, the court holds that the government breached the implied

covenant of good faith and fair dealing, that this breach was material and prior to

plaintiff's failure to pay its royalty payments, and that, therefore, the government may not

collect damages based on its counterclaim.  The court further finds that while plaintiff has

established foreseeable reliance damages, the government has met its burden of

establishing with reasonable certainty that plaintiff would have lost the value of its

47

expenditures made in reliance on the CRADA, even if the government had fully performed under the CRADA.  Therefore, plaintiff may not recover any reliance damages.

Because plaintiff has prevailed in establishing liability, and on the government's counterclaim, it is entitled to costs.  The Clerk is directed to enter judgment consistent with this opinion.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge